STEVEN G. KALAR
Federal Public Defender
JEROME E. MATTHEWS
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone:  (510) 637-3500

Counsel for Defendant MATTHEW LLANEZA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-13 00145 YGR |
| | ) | |
| Plaintiff, | ) | **MATTHEW LLANEZA'S SENTENCING** |
| | ) | **MEMORANDUM AND MOTION FOR** |
| vs. | ) | **DOWNWARD VARIANCE** |
| | ) | |
| MATTHEW LLANEZA, | ) | **Date:  27 February 2014** |
| | ) | **Time: 2:00 p.m.** |
| Defendant. | ) | |
| | ) | |

SENTENCING MEMORANDUM

1

**TABLE OF CONTENTS**

2   1.   Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   2.   Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4        Summary of Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5        Impairment Etiology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6        Grandiosity and Exaggeration in the Face of Functional Impairments. . . . . . . . . 4

7        Susceptibility to Manipulation and Suggestion. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8   3.   Comments to the PSR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9   4.   Sentencing Recommendation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10            A.   A Downward Variance is Appropriate in This Case. . . . . . . . . . . . . . . . . . 9

11                 1.   The Court should examine the government's conduct. . . . . . . . . . 9

12                 2.   Matthew's severe mental illness justifies a downward
                        variance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
13
                 3.   Matthew does not have a significant criminal history. . . . . . . . . 14
14
                 4.   Matthew's Expressed Reticence to do Harm Justifies
15                      A Downward Variance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16                 5.   A 180-month sentence will avoid unwarranted disparity. . . . . . . 16

17                 6.   The totality of the circumstances justify a 180-month
                        sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
18
     5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
19

20

21

22

23

24

25

26

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3
*Atkins v. Virginia*, 536 U.S. 304 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

4
*Gall v. United States*, 128 S. Ct. 586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5
*Jacobsen v. United States*, 503 U.S. 540 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6
*Kimbrough v. United States*, 128 S. Ct. 558 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7
*Nelson v. United States*, 129 S. Ct. 890 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8
*Paris Adult Theatre I v. Slaton*, 413 U.S. 48 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9
*Pepper v. United States*, 131 S. Ct. 1229 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10
*Rita v. United States*, 551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11
*United States v. Bennett*, 9 F. Supp. 2d 513 (E.D.Pa. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 14

12
*United States v. Blake*, 89 F. Supp. 2d 328 (E.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . 11

13
*United States v. Booker*, 543 U.S. 220 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14
*United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15
*United States v. Chambers*, 885 F. Supp. 12 (D.D.C. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 14

16
*United States v. Colace*, 126 F.3d 1229 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17
*United States v. Cook*, 938 F.2d 149 (9th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

18
*United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 13

19
*United States v. Poehlman*, 217 F.3d 212 (9th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

20
*United States v. Risse*, 83 F.3d 212 (8th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21
*United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

22

### DOCKETED CASES

23
*People v. Llaneza*, Santa Clara Superior Court Case No. C1106150. . . . . . . . . . . . . . . . . . . 8

24

25

26

1

**FEDERAL STATUTES**

2     18 U.S.C. § 2332a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3     18 U.S.C. § 3553(a)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4

**STATE STATUTES**

5     Cal. Penal Code §§ 12280(a)(1), 12020(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6

**MISCELLANEOUS**

7     *United States v. Finton*, 3:10-cr-30215 (S.D. Ill.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8     *United States v. Smadi*, 3:09-cr-294 (N.D. Tex.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**1. Preliminary Statement**

It is an open question whether Matthew Llaneza would have participated in a plot to detonate a car bomb had he not been introduced to and guided by an undercover FBI agent. Reasonable minds would likely differ.  The defense believes that Matthew would have continued to post anti-American rants on social media sites and indulged grandiose fantasies about his imagined skills in guerilla warfare had he been left alone.  Perhaps he would have tired of it and created a new identity for himself.  The government believes that Matthew posed a serious terrorist threat and needed to be interdicted by a federal agent posing as a jihadist.  The parties agree, however, on three key points: first, that Matthew is a severely mentally ill young man who has spent the majority of his life undiagnosed and delusional; second, that Matthew's mental illness was a significant contributing factor to the conduct that brings him before the Court for sentencing; and third – after an intensive investigation and frank, earnest settlement discussions – that a sentence of fifteen years (180 months) in prison and a lifetime of supervised release strikes the appropriate and just balance in this case.  A thorough investigation and report by the probation officer reaches the same conclusion.  As discussed at length *post*, Matthew Llaneza asks the Court to accept the parties' joint proposal and the probation officer's recommendation, and sentence him accordingly.

**2. Background**

   **<u>Summary of Offense Conduct</u>**

As the probation officer notes, the underlying investigation seems to have been triggered by a confidential informant's report in December of 2010 that Matthew was seeking information on joining the Taliban.  PSR, ¶ 6.  A number of meetings between Matthew and the informant ensued, during which Matthew made claims of being a trained military operative with bomb-making experience, training others in tactical warfare, building unmanned drones and having worked with drug cartels.  Matthew also claimed to have been in hiding since 2005 because of death threats against him.  PSR, ¶¶ 7 - 11.

On 17 April 2011, Matthew was living in an RV parked in front of his father's home in San Jose.  He began acting erratically and speaking incoherently.  His father, Steve Llaneza, decided it would be best to have Matthew evaluated by a mental health provider and called 911 to have him placed in an appropriate facility.  While Matthew was subject to the mental health hold, Mr Llaneza found an AK-47 within a safe in the RV.  Mr Llaneza turned the rifle and ammunition over to the police, and Matthew subsequently was arrested for possession of an assault weapon and a large capacity magazine.  Matthew pleaded guilty and served one year in the county jail.

After his release from custody, Matthew was supervised by a county probation officer.  Unbeknownst to Matthew, an FBI agent, posing as an assistant to Matthew's probation officer, also monitored him by sitting in on Matthew's visits to the probation office.  The agent thus was in a position to observe firsthand the nature, scope and type of mental health problems Matthew presented.

Citing the FBI's concerns about Matthew's instability, the probation officer referred Matthew to Dr Farhan Matin, a local psychiatrist, for treatment.  At Dr Matin's direction, a psychological evaluation was performed on Matthew Llaneza to determine his cognitive strengths and weaknesses, his capacity for violence, and any indications of malingering.  Dr Matin's treatment of Matthew included diagnosis, symptom identification, and medication management.   Declaration of Federal Public Defender Investigator Frank Tamburello "Tamburello Decl.," ¶ 16.  Dr Matin considered Matthew to be very sick.  At no time did he believe Matthew to be malingering.  Nor, on the other hand, did he think that Matthew would respond to therapy, as therapy required a higher degree of mental functioning in order to be successful.  Tamburello Decl., ¶ 17.

Sometime in 2012, the FBI conducted a threat assessment to determine whether Matthew posed a risk of terrorist activity.  The defense does not know what factors the FBI considered or how the assessment was performed.  But whatever the FBI learned escalated the agency's activity

– the informant ultimately introduced Matthew to the undercover agent with whom the bombing plot was generated.  Over the course of approximately ten weeks, the agent and Matthew met and discussed how the plot was to be carried out.  Although Matthew appeared willing to carry out the attack, he expressed his desire to avoid casualties.  He also suggested an alternate plan, such as using a fake bomb and "failed attacks" that would not involve actual explosions but, through deception and misinformation, would focus attention on militia groups.  Ultimately, however, he and the agent carried out the plan.  Matthew was arrested on 7 February 2013.

This case differs in several material respects from similar fake-bomb operations the FBI has conducted: Matthew was not a radicalized jihadist but rather a delusional, severely mentally disturbed young man; he had no technical skills to speak of; he had no training or background that would have helped him to accomplish an actual bombing; he was preternaturally suggestible and desirous of being accepted; and, not least, he had no desire to inflict mass casualties.  As discussed more fully below, Matthew's background and the underlying facts of this case present compelling reasons to impose the joint sentencing recommendation now before the Court.

**Impairment Etiology**

Matthew's mental illness was noticeable at an early age.  His mother, Dora Tune, states that Matthew could not sit still in his kindergarten class and was constantly disruptive.  His teacher reported that he would be better off repeating kindergarten.  By the time Matthew was in fourth grade, he began to complain that his head "felt funny."  Tamburello Decl., ¶ 4.

These observations were echoed by Steve Llaneza, Matthew's biological father.  PSR, ¶ 54.  Steve Llaneza reported that Matthew had always exhibited strange behavior.  He noted that Matthew would become extremely and inappropriately excited about normal events.  For example, if he and Matthew took a trip to an amusement park, Matthew could not restrain himself and would become almost uncontrollably excited.  Matthew also would exhibit extreme paranoia – if Steve Llaneza had planned a fishing trip, Matthew would constantly proclaim his

fear of drowning or some other catastrophic event.  Matthew would also react strangely to certain stimuli: if he heard a helicopter flying overhead he would curl up into the fetal position.  This eventually escalated to the point that Matthew almost became fearful of Steve Llaneza. Tamburello Decl., ¶ 13.

In short, it was clear that Matthew was suffering from a serious mental illness, though his parents seemed either to ignore it or discount it.  Unfortunately, it was Matthew's arrest for possessing an assault weapon that confirmed it: he suffered from schizophrenia, paranoid psychosis and bipolar disorder.  PSR, ¶¶ 58, 61, 62.[1]

**Grandiosity and Exaggeration in the Face of Functional Impairments**

For most of his life, Matthew has inhabited a world of his own creation.  The record is replete with instances of Matthew claiming knowledge and expertise that in truth he lacked, and describing past experiences that had never occurred.  Among his more notable claims:

The ability to make a small jet plane that could function as an explosive drone;

The ability to make remote controlled submarines;

The training and ability to withstand torture by "erasing" his memory;

Prior training in guerilla warfare and tactical operations;

A desire to negotiate with the Taliban for the release of an American soldier who had been taken prisoner; and,

Expertise in manufacturing explosive devices.

The foregoing boasts are pure fiction.  In fact, Matthew had little if any mechanical aptitude, much less the ability to construct jet planes or submarines.  Steve Llaneza noted that Matthew was in fact mechanically dysfunctional.  He recalled trying to teach Matthew how to fix

---

[1]     The defense obtained and reviewed nearly two thousand pages worth of Matthew's medical records from the following sources: The Social Security Administration; University of California San Francisco Department of Psychiatry; Santa Clara Valley Department of Mental Health; Scottsdale Health Care; and, Crisis Preparation and Recovery, Inc.  Relevant records were provided to the probation officer as part of the pre-sentence investigation.

a bicycle and how to change a bicycle tire for the better part of a year before finally giving up – whatever he taught Matthew was almost instantly forgotten.  Tamburello Decl., ¶ 15.  Jeff Tune, Matthew's stepfather, held the same view.  He noted that Matthew had no mechanical aptitude or dexterity.  He recalled an instance where Matthew became frustrated trying to drill a hole, not realizing that the drill was running in reverse and unable to recognize the problem on his own.  Tamburello Decl., ¶ 6.  Similarly, Arturo Gonzalez, Matthew's grandfather, tried to teach Matthew how to do basic electrical repairs.  Although Matthew would observe the process, he appeared to be distant and wouldn't remember how to perform the repair.  Tamburello Decl., ¶ 10.

So too with his claim of tactical operations prowess.  First, he could barely shoot straight.  Jeff Tune, who is a member of a local shooting range in Mesa, Arizona, demonstrated to Matthew the safe operation of firearms and how to shoot.  Matthew, however, was an inept marksman.  Jeff confirmed that Matthew initially failed to qualify for an Arizona concealed weapons permit because he could not hit a target at a distance of fifteen yards.  Matthew later qualified for and obtained a concealed weapons permit,[2] but only because the range instructor generously interpreted Matthew's shot – which barely hit the fringe of the target – as a qualifying one.

Second, Matthew seemed to lack even basic skills in self-defense.  His grandfather stated that Matthew "couldn't fight his way out of a paper bag."  Tamburello Decl., ¶ 11.  Two incidents confirm this belief.[3]  In the first, Matthew was driving in his car with a girlfriend and learned that she had cheated on him.  Matthew stopped the car and asked her to get out.  The girlfriend responded by choking Matthew, and the fight ultimately ended up on a nearby

---

[2]     It is legal to carry a concealed weapon in Arizona.  A copy of the permit is attached as Exhibit A.

[3]     Copies of the police reports generated in connection with these incidents are attached as Exhibits B and C respectively.

1    sidewalk.  The girlfriend continued her choke-hold, taking Matthew to the ground.  Matthew was

2    able to keep the girlfriend from reaching a pistol that had been in the car.  Police responded and

3    arrested the girlfriend.

4         In the second incident, Matthew was at a friend's apartment cleaning his AK-47 replica

5    rifle.[4]  A person known to Matthew as "KB" entered and said he wanted to take a look at the

6    rifle.  KB wrested the gun from Matthew's grasp and a struggle ensued, during which KB hit

7    Matthew in the face with the butt of the rifle, causing a laceration to Matthew's nose and

8    chipping his front teeth.  Police subsequently arrested KB, who confessed to assaulting Matthew

9    and stealing his rifle.

10        Third, Matthew had no prior training in guerilla warfare or, for that matter, any warfare.

11   To the contrary, he was discharged from the U.S. Marine Corps one month after enlisting due to

12   chronic asthma.

13        This same lack of ability was manifest just prior to Matthew's arrest.  During the course

14   of the FBI's investigation, Matthew was monitored by a confidential informant ("CI") with

15   whom Matthew worked at a plumbing company.  At the outset, the CI noted that Matthew had

16   the "mind of a little child," and was "slow and drooled, while his body often shook

17   uncontrollably."  The CI also noted that Matthew's level of competence was barely above of that

18   of a manual laborer and that he was unable to operate complex machinery.  Later on in the course

19   of their employment, the CI noted that Matthew had been medicated to the point that he could

20   not hold a shovel, and recalled an incident where Matthew inadvertently almost killed the CI by

21   failing to pay attention while flashing a vent on the fourth floor of a construction site.

22        **Susceptibility to Manipulation and Suggestion**

23        Matthew was twice evaluated by Dr Scott Lines during the course of these proceedings.

24

25        [4]     Although such weapons are prohibited in California, their possession is legal in

26   Arizona.  PSR, ¶ 12.

1   Given the extreme and unusual conduct underlying this offense, the second evaluation included

2   the question whether Matthew manifested a high degree of suggestibility while in the manic

3   phase of his bipolar disorder, as is common for those suffering from this particular mental

4   disease.[5]  As Dr Lines explains Matthew's behavior:

5         These are clear manifestations of the irrational flight of ideas found in the typical
          manic episode.  Similarities exist between these bizarre ideas and the irrational
6         thought processes found at the root of his alleged offense conduct.  An idea occurs
          to him, or in the case of his alleged offense conduct, is offered to him, and when
7         he is manic the irrational idea conforms to the desire to stimulate chaos and
          disorder, reflective of the chaos and disorder he feels while under the sway of his
8         mental disorder.

9         The transcripts of Matthew's meetings with a confidential human source, and the

10   recorded conversations between the undercover agent with whom Matthew engaged,[6] contain

11   numerous examples of this very suggestibility:

12        On 16 January 2011, the confidential human source told Matthew "that the brothers are

13   unhappy because he never showed-up [sic] for the meeting.  Based on defense counsel's

14   chronology of events, it appears that Matthew became much more diligent following that

15   conversation.  On 13 December 2011, the source noted that Matthew "does whatever he [the

16   source] tells him to do."[7]

17        The undercover agent who helped to engineer the bomb plot was more direct.  When

18   Matthew suggested the possibility of a failed attack and fake bomb, the agent expressed

19   disagreement:

20        UCE: I know [UI] . . . I know that it [UI . . .] but your plan is [UI] to fail the attack is [UI]

21        MAL: Yeah.

22   _____

23        [5]      A copy of this evaluation is attached as Exhibit D.

24        [6]      The defense does not know how many confidential human sources or informants
     were used in this case.  Accordingly, no attempt is made to distinguish one from another.  Copies
25   of quoted excerpts from the transcripts are collectively attached as Exhibit E.

26        [7]      It appears that the source was discussing Matthew's compliance with work-related
     directives, yet this example is consistent with and demonstrative of malleability.

SENTENCING MEMORANDUM                    7

UCE: You better say no [UI] you may get caught and because I am on of the few Brothers that travels [UI] Afghanistan and back to America [UI] we have our [UI].  I don't think my [UI] will let me get [UI . . . .].  [UI] gonna say no [UI] so I don't think they'll let me do a failed [UI].  [UI . . . .] evidence, they're gonna find it.  I don't [UI . .].  It's too much.  The risk is too high.

MAL: All right.  You're right.

The foregoing individually and collectively demonstrate that Matthew has long suffered from a mental illness that compromised his ability to act rationally, control his behavior and lead some semblance of a normal life.  In the defense's view, it also raises substantial concerns about government overreaching and creating a crime that may never have eventuated.  As discussed more fully *post*, this illness and Matthew's demonstrable reticence fully to embrace the consequences of detonating a bomb also justify the parties' sentencing recommendation.

**3.  Comments to the PSR**

Probation Officer Jessica Goldsberry has authored an excellent and, given the time constraints under which she operated and the volume of material she had to review, thorough report.  Matthew has the following few comments:

¶ 12.  This paragraph should include that Steve Llaneza, Matthew's father, found the AK-47 rifle in a safe in the RV in which Matthew was staying at the time.  Mr Llaneza took the rifle into his house for safekeeping while Matthew was subject to a 5150 mental health hold, and subsequently turned it over to police.[8]

¶ 39.  Matthew pleaded guilty to violating Cal. Penal Code §§ 12280(a)(1) and 12020(a)(2).  Neither of these offenses involved the manufacture or sale of weapons or magazines.  He was convicted of simple possession.

---

[8]     This information was taken from a San Jose Police Report of the incident and a transcript of the preliminary hearing in People v. Llaneza, Santa Clara Superior Court Case No. C1106150, held on 17 May 2011.

**4. Sentencing Recommendation**

*United States v. Booker*, 543 U.S. 220 (2005), directs the sentencing court to impose an appropriate sentence, unencumbered by offense levels, criminal history, or the availability of authorized downward departures.  Under the post-*Booker* discretionary sentencing regime, there is no longer any question that the advisory Guideline range is only one factor among several that this Court is required to consider in determining what constitutes a reasonable sentence.  The guidelines are not to be presumed to be reasonable.  *Nelson v. United States*, 129 S.Ct. 890 (2009).  The Court is free to disagree with Guideline ranges and policy considerations, *see Kimbrough v. United States*, 128 S.Ct. 558, 57 (2007), and is not required to use a formulaic approach yielding a mathematical justification of non-Guidelines sentences.  *Gall v. United States*, 128 S.Ct. 586, 596 (2007).  Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita v. United States*, 551 U.S. 338, 351 (2007).

The foregoing makes clear that the district court has very broad sentencing discretion, limited only by reasonableness and the duty is to impose the *least* amount of time necessary to achieve section 3553(a)'s purposes.  The Guidelines range is subordinate to that duty.

    **A.**    **A Downward Variance is Appropriate in This Case**

        **1.**    **The Court should examine the government's conduct.**

In her sentencing recommendation, the probation officer rightly notes that Matthew had taken no overt steps to plan a terrorist attack prior to meeting the agent, and that there is no evidence that Matthew would or could have carried out this contrived plot without the agent's active participation.  These observations raise an important issue that finds support in precedent.

Had Matthew proceeded to trial, he likely would have requested an entrapment instruction.  Whether the Court would have given an entrapment instruction is debatable.  But courts have made clear that the government could not prove Matthew's predisposition to commit the charged offense simply by showing that he held repugnant fantasies, personal opinions, or

1   inclinations.  *See Jacobsen v. United States*, 503 U.S. 540, 552 (1992) ("a person's inclinations

2   and 'fantasies . . . are his own and beyond the reach of the government" (quoting *Paris Adult*

3   *Theatre I v. Slaton*, 413 U.S. 48, 67 (1973)).  In a similar vein, the salient question is not whether

4   Matthew was willing to commit a crime at the culmination of the undercover operation.  *United*

5   *States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000).  Rather, the question is whether he "would have

6   engaged in such conduct had he not been pushed in that direction by the government."

7   *Poehlman*, 217 F.3d at 704.  Notably, the defendant's lack of "the wherewithal to do so"

8   indicates a lack of predisposition.  *Id.* at 698.

9        Matthew, however, accepted responsibility for his conduct.  Even if he had chosen to go

10   to trial, he does not suggest that the foregoing authority would have compelled the Court to give

11   the jury an entrapment instruction.  He does suggest, however, that there are too many instances

12   where he attempted to avoid engaging in criminal conduct to dismiss the issue out of hand and

13   that the Court should scrutinize the government's conduct.

14        For example, during a conversation with a confidential human source on or about 23

15   November 2011, Matthew stated that "[h]e was no longer interested in collecting weapons and

16   wanted to stay out of trouble."  When (falsely) boasting of his bomb-making expertise, the source

17   noted that Matthew "always rebuts his boasts by saying he wants to stay away from weapons and

18   explosives in accordance with his probation."  Again, when Matthew and the source stopped by a

19   liquor store, Matthew "went into the store but then ran out, [stating] that he was afraid of

20   violating his probation.  Indeed, the source stated that he "still will sometimes push LLANEZA

21   to go to a shooting range with him, but LLANEZA always says that he cant [sic] because of his

22   probation."

23        Wholly aside from the mental illness that permeates this case, the foregoing scarcely fits

24   the profile of a person predisposed to bringing about carnage with an explosive device.  Even the

25

26

1   source admitted that Matthew "seems 'harmless,'" "lacks the capability to live on his own," and

2   that if Matthew "wanted to go and hurt other people, [the source] would know.[9]

3          Dr Matin, Matthew's treating psychiatrist holds a similar opinion.  He noted that risk

4   assessment was a routine component of psychiatric treatment.  Had Matthew uttered a threat

5   towards others or tried to harm himself, Dr Matin was required to report the occurrence.

6   Tamburello Decl., ¶ 18.  Indeed, Dr Matin was surprised to learn that Matthew had been arrested

7   for participating in a bombing plot because he never discerned in Matthew any behavioral

8   indications or other red flags suggesting a propensity for violence.  Tamburello Decl., ¶ 19.

9          Precisely what transpired between Matthew and the undercover agent he ultimately met is

10   not clear.  The many pages of recorded conversations reveal planning, strategy and theorizing,

11   but do little to illuminate Matthew's thought processes.  When viewed through the prism of

12   Matthew's mental illness – a fact well-known to the government because an FBI agent was

13   present at Matthew's numerous meetings with his probation officer during which he exhibited

14   clear signs of thought and behavioral disorder – the defense believes that at the very least the

15   government's conduct was a major contributing factor to the offense conduct.  While that

16   conduct might not satisfy the legal requirements of an entrapment defense, this Court nonetheless

17   may – and on this record, should – take that conduct into account, because "[i]n determining a

18   sentence, it is worth attempting to understand (as best one can) what set a defendant upon [an]

19   illegal course." *United States v. Blake*, 89 F.Supp.2d 328, 332 (E.D.N.Y. 2000).  Stated another

20   way, because one of the central goals of sentencing is to impose a "just" punishment, 18 U.S.C. §

21   3553(a)(2)(A), sentencing courts must look to the specific circumstances surrounding a

22   defendant and his offense conduct:

23          It has been uniform and constant in the federal judicial tradition for the sentencing
            judge to consider every convicted person as an individual and every case as a
24          unique study in the human failings that sometimes mitigate, sometimes magnify,

25

26   _____

        [9]      Excerpts are collectively attached as Exhibit F.

the crime and the punishment to ensue.  Underlying this tradition is the principle
that the punishment should fit the offender and not merely the crime.

*Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal citations and quotations

omitted).

### 2.    Matthew's severe mental illness justifies a downward variance.

§ 3553(a) directs the sentencing court to consider the characteristics of the defendant in

fashioning a reasonable sentence.  Matthew's mental illness is therefore front and center.

At the outset, Matthew's impairments diminish his culpability.  In *Atkins v. Virginia*, 536

U.S. 304 (2002), the Court held that the Eighth Amendment prohibits executing mentally

retarded individuals who commit capital crimes.  *Id.* at 321.  The Court's exegesis on mental

retardation and personal culpability noted that mental impairments by definition limit the

capacity to abstract from mistakes and control impulses, and that although the mental

deficiencies of such defendants "do not warrant an exemption from criminal sanctions, . . . they

do diminish their personal culpability."  *Id.* at 318.

Matthew is not mentally retarded in the classic sense, but there is no dispute that he

suffers from a severe mental illness.  Dr Scott Lines, who evaluated Matthew both for purposes

of competency and the relationship between his mental state and the offense conduct, makes a

number of important observations.  First, Matthew was off his medication at the time he began

meeting with the undercover agent:

> Regarding the involvement of his mental disorder in his alleged offense conduct,
> Matthew Llaneza stated that toward the end of 2012, he stopped taking his
> psychotropic medications.  He couldn't state his rational for stopping the
> medications.  I asked him whether he thought he would currently be in custody
> had he stayed on his medications.  He responded, "I evaluate my behavior as
> irrational and not sane . . . I don't think I'd have done anything if anyone
> approached me, I'd just do what I usually do."  He said, "I was extremely up, like
> I would do anything crazy or off the wall . . . things that are dangerous and
> exciting.  Like my charges."

Second, it is Dr Lines professional opinion that Matthew's capacity to control his

behavior was diminished:

1

2

> It is my clinical opinion that these forces—susceptibility to manipulation and economic need—were sufficient to produce impaired judgment and diminished mental capacity to prevent himself from engaging in the alleged offense conduct. Further, it is my opinion that if Matthew Llaneza had been given adequate psychological and pharmacological treatment during the time period encompassing his alleged offense conduct, he would not have incurred the current charge against him.

3

4

5   Exhibit D.

6       Under Sentencing Guideline § 5K2.13, a sentence below the applicable guideline range

7   may be warranted if the offense was committed while the defendant suffered from a significantly

8   reduced mental capacity:

9

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

10

11

12

13

14

15   USSG. § 5K2.13. In an accompanying Application Note, the Sentencing Commission further

16   clarifies that:

17

> For the purposes of this policy statement—"Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

18

19

*Id.* (Commentary, Appl. Note 1.)

20

21       Section 5K2.13 is one of the so-called "encouraged factors" recognized by the

22   Commission. The "goal of the guideline is lenity toward defendants whose ability to make

23   reasoned decisions is impaired." *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993).

24   This is so "no matter what the nature or severity of his underlying condition." *United States v.*

25   *Lewinson*, 988 F.2d 1005, 1006 (9th Cir. 1993). Reported cases reflect the foregoing

26   admonitions. *E.g., United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000)(departure upheld in

1  sentencing for computer fraud based on defendant's compulsive gambling disorder – no direct

2  causal link between the diminished capacity and the crime charged); *United States v. Risse*, 83

3  F.3d 212 (8th Cir. 1996)(where defendant pled guilty to use of firearm in relation to drug

4  trafficking crime court properly departed downward for diminished capacity based on

5  defendant's post-traumatic stress disorder resulting from service in Vietnam War); *United States*

6  *v. Bennett*, 9 F.Supp.2d 513 (E.D.Pa. 1998)(in largest charitable fraud case in U.S. history

7  departure from 232 months to 141 months upheld due to impairment of defendant's cognitive

8  faculties and/or volition).[10]

9       In this case, Dr. Lines's comprehensive evaluation of Matthew yielded the opinion that

10  while he was not unaware of the wrongfulness of his behavior, he nonetheless suffered from

11  "diminished mental capacity to prevent himself from engaging in the alleged offense conduct."

12  This  deficit is of the type that has formed a recognized basis for downward departure under §

13  5K2.13.  *E.g.*, *United States v. Chambers*, 885 F.Supp. 12, 14 (D.D.C. 1995)(departing from

14  range of 188 - 235 months to 21 months in drug case in part because of diminished capacity

15  traceable to executive function impairments).

16             **3.    Matthew does not have a significant criminal history.**

17       The sentencing guidelines take a one-size fits all approach to 18 U.S.C. § 2332a cases.

18  Subject to  applicable variations on the base offense level, USSG §3A1.4 requires a minimum

19  _____

20       [10]    Prior to November 1998, a diminished capacity downward departure under §
    5K2.13 was only available for someone who committed a "non-violent offense."  Over time, a

21  circuit conflict arose as to whether the departure was available for someone who committed a
    "crime of violence" as that term is defined for purposes of the career offender guideline, § 4B1.2.

22  To address the circuit split, the Sentencing Commission re-drafted § 5K2.13 to re-define the non-
    violent requirement, making clear that the departure is not available if the offense involved actual

23  violence or a serious threat of violence.  *See*, U.S.S.G. Amendment 583, Appendix C,
    Supplement 15 (Nov. 1, 2000).  Accordingly, a person is not disqualified from application of the

24  departure simply because the instant offense fits the strict definition of a "crime of violence"
    under § 4B1.2, as does bank robbery.  The question is whether the offense involved actual

25  violence or serious threat of violence.  In any event, the scope of § 5K2.13 was only a policy
    statement, even prior to *Booker*; because the guidelines are now advisory, such policy statements

26  carry even less weight.

offense level of 32, a 12-level increase if the offense level is less than 32, and application of Criminal History Category VI in all cases.  Although Matthew agrees that the guidelines in his plea agreement are appropriately calculated and apply to his case, it bears mention that they inordinately skew his criminal history.

Matthew's sole prior contact with the criminal justice system is his arrest for being under the influence of a controlled substance and the related, subsequent conviction for possessing an assault weapon.  PSR, ¶¶ 39, 44.  To reprise, the arrest arose from Steven Llaneza's concern that Matthew was exhibiting bizarre behavior and ought to be examined in a mental health facility. Mr Llaneza found the AK-47 in a safe in Matthew's recreational vehicle and turned it over to San Jose Police.

While it is true that Matthew properly was convicted of illegally possessing an assault rifle, the offense was one of geography rather than intent.  Matthew legally purchased and possessed the rifle in Arizona; he was not aware that possessing such a rifle was illegal in the State of California.  Thus, while the guidelines may place him in Category VI, they do not accurately reflect Matthew's criminal history.  In conjunction with the many other factors discussed in this memorandum, Matthew's history confirms that a sentence of 180 months is sufficient.

### 4. Matthew's Expressed Reticence to do Harm Justifies A Downward Variance.

As stated in the previous section, §3A1.4 automatically places Matthew in Criminal History Category VI.  In addition to overstating criminal history, rigid calculations such as these cast aside any consideration of the individual defendant's offense conduct.  This case demands such consideration.

During the course of the underlying investigation, Matthew often expressed an unwillingness to engage in criminal conduct.  As stated *ante*, during a conversation with a confidential human source on or about 23 November 2011, Matthew stated that "[h]e was no

longer interested in collecting weapons and wanted to stay out of trouble."  Similarly, during his

meetings with the undercover agent, Matthew expressed hesitation about the harm an explosion

might cause.  And, as noted *ante*, on one occasion he suggested that the plan could be based on a

"failed attack" that involved a bomb threat attributable to an American militia that would lead to

the discovery of a fake bomb.

Moreover, in stark contrast to the many cases in which the FBI plots with a true terrorist

who wishes to inflict as many casualties as possible, Matthew was very troubled by that

possibility and sought to avoid it.[11]  An FBI Meeting Summary dated 12 January 2013 notes:

> The UCE [undercover agent] then asked LLANEZA what time he wanted to do
> the bombing.  LLANEZA replied that they had a short window between 2 and 3
> am since people started coming to work around 4 am.  LLANEZA wanted to
> avoid killing people unnecessarily.

(Excerpt attached as Exhibit G.)

This disparity, in conduct and intent, between Matthew and those defendants who truly

wish to visit as much harm as possible upon American citizens, counsels against a guideline

sentence and provides additional support for the parties' proposed disposition.

### 5.    A 180-month sentence will avoid unwarranted disparity.

§ 3553(a)(6) directs the district court to consider the need to avoid unwarranted sentence

disparities among defendants with similar records who have been convicted of similar conduct.

Although the government has conducted a number of fake bomb operations nationwide, defense

counsel has not been able to find a case with a fact pattern quite like Matthew's.  A recent case,

albeit one that was prosecuted by the Manhattan District Attorney, is nonetheless informative.  In

that case, evidence demonstrated that the defendant intended to detonate bombs in various areas

---

[11]    *E.g.*, *United States v. Smadi*, 3:09-cr-294 (N.D. Tex.) (Defendant emigrated to
U.S. to perform terrorist attacks and chose to bomb 60-story glass building with five banks in it
and planting separate time-delayed bomb to kill rescue workers); *United States v. Finton*, 3:10-
cr-30215 (S.D. Ill.) (Defendant, a convicted robber radicalized by Islam, planned to pose as FBI
agent to kidnap and execute a U.S. Senator on videotape and ultimately proposed bombing the
Springfield, IL federal building to kill everyone inside it and then detonate a second bomb to kill
rescue workers).

1   of New York City to avenge the death of a radical Muslim cleric.  The defendant targeted, among

2   other things, Army recruitment offices, police officers and Jews.  The defendant pleaded guilty

3   under a plea agreement with an agreed sentence of 16 years.  The district attorney noted that the

4   sentence was "in line with what many similar defendants in federal cases have received."[12]

5   Notably, although the FBI had monitored the defendant, it decided not to pursue charges.[13]  And,

6   unlike the present case, there did not appear to be any evidence that the defendant suffered from a

7   severe mental illness.

8   **6.  The totality of the circumstances justify a 180-month sentence.**

9        A number of factors militate in favor of leniency in this case, each for a discrete reason.

10  But individual reasons do not limit the Court's ability to consider the totality of the

11  circumstances.  Even prior to *Booker*, the district court could base its sentence on an aggregation

12  of factors, each of which might individually have been insufficient to justify departure.  *United*

13  *States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991).  In *Cook* the court explained that "[t]here was

14  no reason to be so literal-minded as to hold that a combination of factors cannot together

15  constitute a 'mitigating circumstance.'"  *Id.* at 153.  When a combination of factors is posited as a

16  basis for a downward departure, the question becomes whether in totality they present a uniquely

17  mitigating set of circumstances.  *Cook* elaborated further on this principle, noting that factors that

18  appear insufficient in isolation can present a compelling mosaic when viewed together:

19          Given the Sentencing Commission's acknowledgment of 'the vast range of
            conduct' not encompassed by the Guidelines, a unique combination of factors may
20          constitute the 'circumstance' that mitigates . . ..  What the Commission has
            focused on is 'the case' conduct.  Neither case nor conduct can be reduced to a
21          single factor.  Case and conduct are a total pattern of behavior.  In making a
            decision in any particular case, good judgment will often require the evaluation of
22

23          [12]    A copy of the New York Times article describing the case is attached as Exhibit

24  H.

25          [13]    The government has faced mounting criticism of its fake bomb sting operations.
    U.S. District Judge Colleen McMahon, while rejecting an entrapment defense in such a case,
26  stated, "Only the government could have made a 'terrorist' out of [the defendant], whose
    buffoonery is positively Shakespearean in its scope."

SENTENCING MEMORANDUM                        17

a complex of factors.  No single factor may be enough to point to the wise course of discretion.  But a wise person will not look at each particular factor abstractly and alone.  *Rather it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision.*

*Id.* at 153 (emphasis added); s*ee also United States v. Colace*, 126 F.3d 1229, 1231 n.2 (9th Cir. 1997)(approving consideration of otherwise non-qualifying factors by aggregating into a totality of circumstances analysis).

Here, the Court is presented with a compelling case for the proposed 180-month sentence: a mentally disturbed young man with a minimal, circumstantial criminal history, who: becomes involved in a plot to bomb a bank but is worried that being found in a liquor store might violate the terms of his then-existing probation; professes to be a highly trained operative but has an assault rifle taken from his hands and is unable to defend himself; boasts of advanced tactical skills and the ability to manufacture sophisticated weaponry yet can't change a bicycle tire; and, stresses to his supposed co-conspirator that they ought to take steps to minimize injury.  Whether viewed as a guidelines departure or a variance under § 3553(a), the parties and the probation officer believe that a 180-month sentence is just, appropriate, and sufficient to accomplish the goals of sentencing.

**5.  Conclusion**

For the reasons stated, Matthew Llaneza respectfully requests that the Court impose a sentence of 180 months, as provided in the parties' plea agreement and recommended by the probation officer.

Dated: 21 February 2014

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

/s/
JEROME E. MATTHEWS
Assistant Federal Public Defender