# EXHIBIT A

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

20090070371



FPD_ML-001883

# EXHIBIT B

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

*Released to Frank Tamburello/Fed Public Defender   03/27/13 PH #13462   Mesa Police Records*

| | | | |
|---|---|---|---|
| **I N C I D E N T** | Agency Name<br>*Mesa Police Department* | **INCIDENT / INVESTIGATION REPORT** | OCA<br>*2009-0070371* |

**INCIDENT DATA**

| | Crime Incident | | UCR: 13B | Local Statute: 13-1203A1 | ☐ Att ☑ Com | Date / Time Reported<br>*WE Jan 7, 2009*  *13:11* |
|---|---|---|---|---|---|---|
| #1 | *ASSAULT-INTENT-RECKLESS-INJURE - DV* | | | | | Occurred From<br>*WE Jan 7, 2009*  *11:45* |
| #2 | Crime Incident | | UCR: | Local Statute: | ☐ Att ☐ Com | At Found<br>*WE Jan 7, 2009*  *11:50* |
| #3 | Crime Incident | | UCR: | Local Statute: | ☐ Att ☐ Com | |

Location of Incident   *7302 E Main St, Mesa, AZ 85207*      Premise Type   *Parking Lot/Garage*      Offense Tract   *ALL*

**MO**

How Attacked or Committed

Weapon / Tools   *Personal Weapons (Hands, Etc.)*      Forcible Entry   ☐ Yes   ☐ No   ☑ N/A

**VICTIM**

# Victims      Type  Individual      Injury   Apparent Minor Injury      Residency Status   Unknown

| | Victim/Business Name (Last, First, Middle) | Victim of Crime #<br>*1* | Age / DOB<br>*24* | Race | Sex |
|---|---|---|---|---|---|
| V1 | *Llaneza, Matthew Aaron* | Relationship to Offenders<br>*1BG* | | *W* | *M* |

Home Address          Home Phone

Employer Name/Address          Business Phone

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**OTHERS INVOLVED**

CODES:  V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)   I = Other Involved

| Code | Name (Last, First, Middle) | Victim of Crime # | Age / DOB | Race | Sex |
|---|---|---|---|---|---|

Home Address          Home Phone

Employer Name/Address          Business Phone

| Code | Name (Last, First, Middle) | Victim of Crime # | Age / DOB | Race | Sex |
|---|---|---|---|---|---|

Home Address          Home Phone

Employer Name/Address          Business Phone

**ID**

| Approving Officer Signature<br>*(10059) GONZALES, M* | Approval Date<br>*01/07/2009 15:00:58* | Approving Supervisor Signature<br>*(07945) MAUSER, D* | Approval Date<br>*01/12/2009 11:57:01* |
|---|---|---|---|
| Complainant Signature | Case Status:<br>*Cleared Arrest*<br>*January 7, 2009* | Case.Disposition:<br>*Cleared By Arrest*<br>*Jan 7, 2009* | |

Page:  1

## Incident / Investigation Report

*Mesa Police Department*

DR# : *2009-0070371*

<table>
<tr><td rowspan="2">O<br>F<br>F<br>N<br>D<br>R</td><td colspan="2">Offender(s) Suspected of Using</td><td colspan="2">Offender 1    SU1</td><td colspan="2">Offender 2</td><td></td><td colspan="2">Offender 3</td><td></td><td>Primary Offender<br>Resident Status</td></tr>
<tr><td>☐ Drugs    ☑ N/A</td><td></td><td>Age: 20</td><td>Race: B   Sex: F</td><td>Age:</td><td>Race:</td><td>Sex:</td><td>Age:</td><td>Race:</td><td>Sex:</td><td>☑ Resident</td></tr>
<tr><td></td><td>☐ Alcohol<br>☐ Computer</td><td></td><td colspan="2">Offender 4</td><td colspan="2">Offender 5</td><td></td><td colspan="2">Offender 6</td><td></td><td>☐ Non-Resident</td></tr>
<tr><td></td><td></td><td></td><td>Age:</td><td>Race:   Sex:</td><td>Age:</td><td>Race:</td><td>Sex:</td><td>Age:</td><td>Race:</td><td>Sex:</td><td>☐ Unknown</td></tr>
</table>

<table>
<tr><td rowspan="9">S<br>U<br>S<br>P<br>E<br>C<br>T</td><td colspan="3">Name (L, F M)   Grogan, Melinda Denee<br>SU1    AKA</td><td colspan="4">Home Address<br>1414 E 22nd Ave, Apache junction, AZ</td><td>Home Phone</td></tr>
<tr><td colspan="3">Occupation</td><td colspan="4">Business Address</td><td>Business Phone</td></tr>
<tr><td>DOB.  /  Age          Race</td><td>Sex</td><td>Hgt          Wgt</td><td colspan="2">Build</td><td>Hair Color   Black</td><td colspan="2">Eye Color   Brown</td></tr>
<tr><td>20      B</td><td>F</td><td>5'07        109</td><td colspan="2">Hair Style</td><td>Hair Length</td><td colspan="2">Glasses</td></tr>
<tr><td colspan="8">Scars, Marks, Tattoos, or other distinguishing features (i.e. limp, foreign accent, voice characteristics)</td></tr>
<tr><td>Hat</td><td colspan="2">Shirt/Blouse</td><td colspan="2">Coat/Suit</td><td></td><td colspan="2">Socks</td></tr>
<tr><td>Jacket</td><td colspan="2">Tie/Scarf</td><td colspan="2">Pants/Dress/Skirt</td><td></td><td colspan="2">Shoes</td></tr>
<tr><td>Was Suspect Armed?    Type of Weapon</td><td colspan="3"></td><td colspan="2">Direction of Travel</td><td colspan="2">Mode of Travel</td></tr>
<tr><td>VYR      Make</td><td colspan="2">Model</td><td>Style/Doors   Color</td><td colspan="2">Lic/Lis</td><td colspan="2">Vin  .</td></tr>
</table>

| Suspect Hate / Bias Motivated: | ☐ Yes  ☑ No | Type: |
|---|---|---|

<table>
<tr><td rowspan="2">W<br>I<br>T<br>N<br>E<br>S<br>S</td><td>Name (Last, First, Middle)<br>Walter, David W</td><td>D.O.B.</td><td>Age<br>66</td><td>Race<br>W</td><td colspan="2">Sex<br>M</td></tr>
<tr><td>Home Address<br>10440 E Irwin Cir, Mesa, AZ 85209</td><td>Home Phone</td><td colspan="2">Employer</td><td colspan="2">Phone</td></tr>
</table>

**N A R R A T I V E**

On 01-07-2009 at 1203 hours I responded to a family fight call at 7302 E, Main St. The call was originally dispatched at 1151 hours. Office Valle and Ramirez were on scene, when I responded. Earlier, dispatch stated that a female and male were involved in physical fight and a handgun was involved.

Upon my arrival Office Ramirez told me that a witness assisted the male by securing the handgun, while the female assaulted the male. Officer Ramirez told me the male was holding the holstered handgun against his chest, while the female assaulted him. The male then passed the handgun to the witness, who secured it. The incident occurred on a sidewalk in front of Giovanni's Hair Salon. Officer Ramirez was standing with the female, who was identified as Melinda Denee Grogen, age twenty. Officer Valle was standing with the male, who was identified as Matthew A. Llancza, age twenty-four. Officer Valle secured the handgun. Mesa Fire Paramedics checked and treated Matthew because he complained of difficult breathing. Matthew was cleared of any serious medical problems by E-209 A-Shift.

Page: 2

FPD_ML-001872

## Incident / Investigation Report

*Mesa Police Department*

DR#:  *2009-0070371*

### Officer's Narrative (continued)

I first spoke with Melinda and I asked her tell me what happened. Melinda told me the following: Melinda and Mathew had been boyfriend and girlfriend for over a year. They lived together in a Mesa apartment for about one year. They recently began living apart with their own families. On 01-06-2009, Melinda and Matthew ended their relationship. On 07-07-2009, Matthew drove to Melinda sister's home, where Melinda was staying. Matthew wanted to collect some personal property from Melinda. Mathew located Melinda walking on the street near her sister's home. Melinda stepped into Matthew's vehicle and Matthew asked Melinda if she had sex with someone during the night. Melinda told Matthew she slept with a male friend. Mathew then told Melinda their relationship was final. Melinda began pleading with Matthew to take her back. They began to argue and police arrived. Melinda said nothing else happened.

I asked Melinda, if Matthew assaulted her and she said, "No." I asked Melinda what occurred with the handgun. Melinda said, "Nothing, its Matthew's gun." I asked Melinda if she assaulted Matthew and she said, "I just put my hands on his neck asking him to take me back." I reminded Melinda that a witness saw her assault Matthew. Melinda did not respond.

I then spoke with Matthew, who told me the following: Matthew and Melinda lived together as boyfriend and girlfriend for one year. They recently began living apart with their own families. On 01-06-2009 Matthew broke up with Melinda. On the morning of 01-07-2009, Matthew spoke with Melinda's sister, who told Matthew that Melinda had cheated on him with a male friend. Matthew drove to Melinda sister's home to finalize their relationship and to gather some personal belongings. Matthew located Melinda walking near her sister's home at about 8000 E. University. Matthew told Melinda he wanted to end their relationship and he wanted some person jewelry items. Melinda opened the passenger door to Matthew's vehicle and she forced her way into the passenger seat. Matthew asked her to get out of his vehicle and she refused. Matthew then began driving, with Melinda in the vehicle. Matthew asked Melinda if she had cheated on him by sleeping with her male friend. Melinda acknowledged that she did have sex with her male friend. At this time Matthew had driven his vehicle into the strip center at 7300 E. Main St. Matthew stopped his vehicle and he asked Melinda to get out. Melinda refused and she began placing her arms around Matthew's head and neck. Melinda pleaded for Matthew to take her back. Melinda maintained a tight hold and Matthew until he was able to step out of his vehicle. Matthew stood by and he saw Melinda rifling through the interior of his vehicle. Matthew then realized that Melinda was trying to locate his handgun. Matthew stepped back into his vehicle and he removed the handgun from under the front seat. The handgun was in a brown leather holster. Matthew walked away from his vehicle leaving Melinda behind. Matthew walked on the sidewalk close the business fronts. Melinda remained in the vehicle, which was parked along the sidewalk in the parking lot. Melinda suddenly stepped out of the vehicle and she ran towards Matthew. Melinda positioned herself behind Matthew and she placed him in a chokehold. Matthew fell onto the sidewalk and Melinda fell on top of him. Matthew continued to clutch the handgun against his chest and he was determined to keep the handgun from Melinda. Matthew was finally able to pass the handgun to a male witness, who was standing by. The witness was later identified as David Walter. Mathew pushed the handgun along the sidewalk so Walter could secure it. Melinda was on top of Matthew maintaining her hold on him, when he passed the handgun to Walter. Melinda released her hold and Office Valle arrived on scene.

Matthew told me that Melinda was a diagnosed Schizophrenic and her behavior at times was very irrational. Matthew produced a Concealed Weapons Permit, which is attached to this report.

I asked Matthew if he was injured during the struggle with Melinda. Matthew pulled up his pant leg and he showed me a 2" red abrasion on his shin. Matthew also told me that his shoulder was healing from another injury and it was slightly sore after the struggle.

Page: 3

FPD_ML-001873

## Incident / Investigation Report

*Mesa Police Department*

DR#:  *2009-0070371*

**Officer's Narrative (continued)**

Walter left prior to my arrival but he completed a written statement that confirms Matthew`s story and written statement. See Walter`s written statement.

Officer Ramirez spoke to a second witness. See Officer Ramirez`s supplemental report for the witness statement and identification.

I placed Melinda under arrest at 1245 hours and Officer Ramirez transported and booked her at the Mesa Police Holding Facility. I completed a citation for one count of ARS 13-1202 A.1, Assault (DV), a class one misdemeanor.

Prior to leaving the scene, Officer Ramirez secured Matthew`s handgun and he placed it in the trunk of Matthew`s vehicle. I advised Matthew of this. The handgun was described as a Makara, 9mm, black in color, SN#DF6022, with two eight round magazines.

Cleared arrest.
No further action.

Page:  4

FPD_ML-001874

## Incident/Investigation Supplement Report

Page: 2

**Agency:** MPD
**Case Number:** 2009-007037/1
**Original Case Officer:** (10059) GONZALES, M

| Supplement Date | Supplement Type | | Officer | |
|---|---|---|---|---|
| 01/07/2009 13:54:13 | INVESTIGATION | | (13484) RAMIREZ, A | |
| Approving Officer | Date/Time | | Approving Supervisor | Date/Time |
| (13484) RAMIREZ, A | 01/07/2009 14:06:45 | | (07945) MAUSER, D | 01/12/2009 11:44:55 |

**SUPPLEMENT NARRATIVE**

NARRATIVE:

ON 01-07-2009 AT 1158 HOURS, I RESPONDED TO 7302 E MAIN ST IN MESA FOR A REPORT OF A SUBJECT DISTURBING.

UPON ARRIVAL, I CONTACTED THE REPORTIMNG PARTY. THE REPORTING PARTY IDENTIFIED HERSELF AS MARY JANE SUBIRAN[                ]. MARY STATED THAT SHE WAS OUTSIDE OF THE HAIR SALON WHERE SHE WAS WORKING SMOKING A CIGERET. MARY SAID THAT WHEN SHE FINISHED HER BREAK, SHE BEGAN TO WALK BACK INTO THE HAIR SALON. MARY TOLD ME THAT A WHITE MALE (LATER IDENTIFIED AS MATTHEW LLANEZA) APPROACHED HER CARRYING A BUNDLE OF CLOTH. MARY INFORMED ME THAT MATTHEW ASKED HER IN HE COULD USE HER PHONE.

MARY STATED THAT SHE TOLD MATTHEW THAT HE COULD NOT USE HER PHONE AND MATTHEW REQUESTED THAT SHE CALL THE POLICE. MARY SAID THAT MATTHEW INFORMED HER THAT THE BLACK FEMALE (LATER IDENTIFIED AS MELINDA GROGEN) WOULD NOT GET OUT OF HIS VEHICLE AND WOULD LIKE THE POLICE TO BE CALLED BECAUSE SHE WAS HURTING HIM. MARY TOLD ME THAT SHE CALLED THE POLICE AND BEGAN TO GIVE THE DISPATCHER MATTHEW'S MESSAGE. MARY INFORMED ME THAT AS SHE SPOKE TO THE POLICE DISPATCHER, MELINDA EXITED THE VEHICLE AND JUMPED ONTO MATTHEW'S BACK.

MARY STATED THAT SHE OBSERVED MELINDA GRAB MATTHEW BY THE THROAT IN A MANNER TO ATTEMPT TO CHOKE HIM. MARY SAID THAT MATTHEW FELL TO THE GROUND WHEN MELINDA JUMPED ONTO HIS BACK. MARY INFORMED ME THAT MATTHEW TOLD HER THAT HE HAD A FIREARM IN THE BUNDLE AND WANTED HER TO SECURE IT AS MELINDA ATTEMPTED TO WRESTLE THE BUNDLE AWAY FROM MATTHEW. MARY CONTINUED BY SAYING THAT MATTHEW PUSHED THE BUNDLE TO HER AND ANOTHER MAN STOOD ON THE GUN UNTIL POLICE ARRIVED. (SEE MARY'S WITNESS STATEMENT)

I INFORMED OFFICER M. GONZALES #10059 OF WHAT MARY HAD TOLD ME.

AFTER MARY WAS PLACED UNDER ARREST BY OFFICER GONZALES, I TRANSPORTED HER TO THE MESA CITY JAIL WHERE I BOOKED HER ON 13-1203A1 ASSAULT DV. C1M.

I HAD NO FURTHER INVOLVEMENT IN THE INVESTIGATION.

N.F.I.

FPD_ML-001885

# EXHIBIT C

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

*Released to Frank Tamburello/Fed Public Defender  03/27/13 PH #13462  Mesa Police Records*

| I N C I D E N T | Agency Name    *Mesa Police Dept.* | | **INCIDENT / INVESTIGATION REPORT** | OCA | *2009-1320447* | | |
|---|---|---|---|---|---|---|---|
| | | | | Date / Time Reported | | | |
| | | | | *TU May 12, 2009* | | | *11:39* |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D A T A | #1 | Crime Incident  *ARMED ROBBERY-THREAT USE WPN* | UCR: 120 | Local Statute: 13-1904A2 | ☐ Att  ☑ Com | Occurred From  *TU May 12, 2009* | | | *11:39* |
| | #2 | Crime Incident  *TRAFFICK STOLEN PROP 1ST DEG* | UCR: 280  Activity: Not Specified | Local Statute: 13-2307B | ☐ Att  ☑ Com | At Found  *TU May 12, 2009* | | | *11:39* |
| | #3 | Crime Incident  *SELL DRUGS IN DRUG-FREE ZONE* | UCR: 35A  Activity: Not Specified | Local Statute: 13-3411A1 | ☐ Att  ☑ Com | | | | |

| Location of Incident    *1146 W Drummer Ave, Mesa, AZ 85210* | | Premise Type    *Residence/Home* | Offense Tract   *ALL* |
|---|---|---|---|

**MO**

| How Attacked or Committed | | | |
|---|---|---|---|
| Weapon / Tools    *Automatic Rifle* | | Forcible Entry  ☐ Yes  ☐ No  ☑ N/A | |

| V I C T I M | # Victims | Type  Individual | Injury  Loss Of Teeth, Apparent Minor Injury | | Residency Status  Resident | | |
|---|---|---|---|---|---|---|---|
| | Victim/Business Name (Last, First, Middle) | | | Victim of Crime #  *1* | Age / DOB  25 | Race | Sex |
| | **V1** *Llaneza, Matthew Aaron* | | | Relationship to Offenders  *1AQ* | | *W* | *M* |
| | Home Address | | | | Home Phone | | |
| | Employer Name/Address | | | | Business Phone | | |
| | VYR | Make | Model | Style | Color | Lic/Lis | VIN |

| O T H E R S  I N V O L V E D | CODES:  V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)  I = Other Involved | | | | | | |
|---|---|---|---|---|---|---|---|
| | Code | Name (Last, First, Middle) | | | Victim of Crime # | Age / DOB | Race | Sex |
| | **IO1** | *Dr Eder* | | | | | *U* | *M* |
| | Home Address | | | | | Home Phone | |
| | Employer Name/Address  *Scottsdale Memorial / 7400 E OSBORN SCOTTSDALE, AZ* | | | | | Business Phone | |
| | Code | Name (Last, First, Middle) | | | Victim of Crime # | Age / DOB | Race | Sex |
| | Home Address | | | | | Home Phone | |
| | Employer Name/Address | | | | | Business Phone | |

| ID | Approving Officer Signature  *(14449) LANDER, V* | Approval Date  *05/17/2009 13:01:56* | Approving Supervisor Signature  *(14740) SCOTT, K* | Approval Date  *05/17/2009 15:07:04* |
|---|---|---|---|---|
| | Complainant Signature | Case Status:  *Cleared Arrest*  *May 14, 2009* | Case Disposition:  *Cleared By Arrest*  *May 14, 2009* | |

Page: 1

FPD_ML-001887

## Incident / Investigation Report

*Mesa Police Dept.*

DR#: *2009-1320447*

| O F F N D R | Offender(s) Suspected of Using | | Offender 1 | SU1 | | Offender 2 | | | Offender 3 | | | Primary Offender Resident Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ☐ Drugs  ☑ N/A | | Age: *21* | Race: *B* | Sex: *M* | Age: | Race: | Sex: | Age: | Race: | Sex: | ☑ Resident |
| | ☐ Alcohol | | Offender 4 | | | Offender 5 | | | Offender 6 | | | ☐ Non-Resident |
| | ☐ Computer | | Age: | Race: | Sex: | Age: | Race: | Sex: | Age: | Race: | Sex: | ☐ Unknown |

| S U S P E C T | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name (L. F M) *Bowe, Kareem Calvin* | | | | | | Home Address | | | | Home Phone | |
| SU1   AKA *Kareem Kalvin* | | | | | | *718 S Alma School Rd Apt. 243, Mesa, AZ* | | | | | |
| Occupation | | | | | Business Address | | | | | Business Phone | |

| DOB. / Age | | Race | Sex | Hgt | | Wgt | Build | | Hair Color *Black* | | Eye Color *Brown* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | *21* | *B* | *M* | *5'08* | | *145* | Hair Style | | Hair Length | | Glasses |

Scars, Marks, Tattoos, or other distinguishing features (i.e. limp, foreign accent, voice characteristics)

| Hat | | Shirt/Blouse | | Coat/Suit | | | Socks | |
|---|---|---|---|---|---|---|---|---|
| Jacket | | Tie/Scarf | | Pants/Dress/Skirt | | | Shoes | |
| Was Suspect Armed? | Type of Weapon | | | | Direction of Travel | | Mode of Travel | |

| VYR | Make | | Model | Style/Doors | Color | Lic/Lis | | Vin | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Suspect Hate / Bias Motivated: | ☐ Yes  ☑ No | Type: | |
|---|---|---|---|

| W I T N E S S | Name (Last, First, Middle) | | | D.O.B. | Age | Race | Sex | |
|---|---|---|---|---|---|---|---|---|
| | *Brown, Darlene Roberta* | | | | 37 | B | F | |
| | Home Address | | | Home Phone | Employer | | | Phone |
| | *1146 W Drummer Ave, Mesa, AZ 85210* | | | | *Knights Transportation* | | | |

**SYNOPSIS:**

ON 05-12-09 AT APPROXIMATELY 1139 HOURS I RESPONDED TO 1146  W. DRUMMER, IN MESA, IN REFERENCE TO AN AGENCY ASSIST CALL.  CALL COMMENTS STATED THIER WAS A 28 YEAR OLD MALE WITH BLOOD ALL OVER HIM AND UNCONTROLLED BLEEDING.

**NARRATIVE:**

WHEN I ARRIVED ON SCENE OFFICER DUKE #14406, MESA FIRE DEPARTMENT ENGINE 204, AND SOUTHWEST AMBULANCE WERE ON SCENE WITH MATTHEW LLANEZA WHO I  IDENTIFIED BY HIS ARIZONA DRIVERS LICENSE. MATTHEW WAS BEING  COMBATIVE AND NOT RESPONDING TO QUESTIONS.  HE HAD TO BE  RESTRAINED, ON THE GURNEY, BY THE FIRE DEPARTMENT.  MATTHEW WAS TRANSPORTED TO SCOTTSDALE MEMORIAL HOSPITAL WITH NON-LIFE THREATENING INJURIES.

DARLENE BROWN WHO WITNESSED THE INCIDENT WROTE THE FOLLOWING STATEMENT.  SHE STATED AT 1145 HOURS A GUY SHE KNOWS AS "K.B.", WHO WAS LATER IDENTIFIED BY COURT PAPERWORK LEFT IN APARTMENT 1148, AS BEING KAREEM CALVIN BOWE KNOCKED ON HER DOOR.  SHE STATED AT THE TIME MATTHEW, WHO IS HER

Page:  2

FPD_ML-001888

## Incident / Investigation Report

*Mesa Police Dept.*

DR#: *2009-1320447*

### Officer's Narrative (continued)

ROOMMATE, WAS CLEANING HIS AK-47 RIFLE. DARLENE SAID WHEN SHE HEARD THE KNOCK AT THE DOOR SHE TOLD MATTHEW TO GO PUT THE GUN AWAY. SHE SAID MATTHEW PUT THE GUN AWAY, BUT WAS STILL MESSING WITH THE BULLETS AND THE CLIP. DARLENE TOLD HIM TO PUT THE BULLETS AND THE CLIP AWAY BECAUSE K.B. WAS AT THE DOOR. SHE STATED MATTHEW TOLD HER "NO" BECAUSE K.B. WAS NOT GOING TO KNOW HE HAD A GUN. DARLENE SAID SHE LET K.B. IN THE HOUSE AND HE ASKED MATTHEW WHERE THE REST OF THE GUN WAS BECAUSE HE WANTED TO SEE IT. SHE STATED MATTHEW WENT INTO THE BACK ROOM AND GOT THE GUN. DARLENE SAID K.B. SNATCHED THE GUN FROM MATTHEW, LOADED THE CLIP, AND RAN OUT OF THE DOOR. DARLENE SAID MATTHEW WENT AFTER HIM AND THEY WERE WRESTLING ON THE PORCH. SHE SAID K.B MUST HAVE HIT MATTHEW, TOOK OFF RUNNING, AND GOT INTO A CAB WITH THE GUN. SHE STATED MATTHEW CAME INSIDE BLOODY, SAID K.B. TOOK HIS GUN, AND TOLD HER THE GUN IS LOADED. DARLENE SAID K.B. KNOCKED OUT MATTHEW`S FRONT TEETH AND THE AMBULANCE TOOK HIM TO THE HOSPITAL. ( REFER TO WITNESS STATEMENT)

AT THE SCENE THERE WAS SOME BLOOD SPLATTER BY THE FRONT DOOR AND IN THE PATIO AREA WHERE MATTHEW AND KAREEM WERE WRESTLING.

I FOLLOWED SOUTHWEST AMBULANCE TO THE HOSPITAL AND SPOKE WITH REGISTERED NURSE VICKI WHO STATED MATTHEW`S INJURIES WERE NON-LIFE THREATENING. SHE STATED HE WOULD BE TREATED BY DOCTOR EDER. RN VICKI STATED MATTHEW MAY POSSIBLY HAVE A CONCUSSION DUE TO HIS VOMITING.

I CONTACTED MATTHEW AND NOTICED HE HAD A SCAR ON HIS NOSE THAT WAS BLEEDING AND THREE OF HIS FRONT TEETH WERE CHIPPED. WHEN I ASKED MATTHEW WHAT HAPPENED, HE STATED, "THAT GUY STOLE MY AK-74 HUNTING RIFLE AND TOOK OFF IN A CAB." I ASKED MATTHEW IF THE RIFLE WAS AN AK-47. HE STATED THE RIFLE WAS NOT AK-47, IT WAS AN AK-74 HUNTING RIFLE. MATTHEW STATED HE HAS BEEN LIVING AT APARTMENT #1146 FOR ABOUT A WEEK. HE SAID A BLACK MALE WALKED INTO THE APARTMENT, SAW HIS RIFLE, AND SNATCHED IT OUT OF HIS HAND. MATTHEW SAID HE PUNCHED THE SUSPECT WHO TURNED AROUND AND HIT HIM IN THE FACE WITH THE BUTT OF THE RIFLE CAUSING A CUT TO HIS NOSE AND CHIPPING HIS FRONT TEETH. HE STATED AFTER THE SUSPECT HIT HIM WITH THE GUN HE RAN AND GOT INTO THE BACK SEAT OF A WHITE CAB, WHICH WAS DRIVEN BY AN UNKNOWN WHITE MALE. MATTHEW STATED THE VEHICLE LOOKED LIKE IT WAS SOLD FROM A CAB COMPANY, BUT WAS BEING USED AS A PERSONAL VEHICLE. HE STATES HE HAS SEEN THE VEHICLE NUMEROUS TIMES AT PAZ DE CRISTO. MATTHEW DESCRIBED THE SUSPECT AS BEING A BLACK MALE, APPROXIMATELY 25 YEARS OF AGE, WITH A SKINNY BUILD. HE STATED HE DOES NOT KNOW THE SUSPECT, BUT HE HAS SEEN HIM IN THE AREA ON NUMEROUS OCCASIONS. MATTHEW DID NOT KNOW THE SERIAL NUMBER FOR THE RIFLE. I LEFT A BUSINESS CARD WITH HIM AND ADVISED HIM WHEN HE WAS RELEASED FROM THE HOSPITAL TO CALL ME WITH THE SERIAL NUMBER FOR THE RIFLE.

CST KOLHEPP #14175 ARRIVED ON SCENE AND PHOTOGRAPHED THE INJURY TO MATTHEW`S NOSE AND HIS TEETH. HE ALSO PHOTOGRAPHED THE BLOOD SPLATTER AT THE ORIGINAL SCENE AND COLLECTED MATTHEW`S BLOODY SHIRT.

MATTHEW STATED HE DESIRES PROSECUTION IN THIS MATTER.

DETECTIVE VAN GALDER #15771 ARRIVED ON SCENE AND TOOK OVER THE INVESTIGATION.

NFI

INVESTIGATION CONTINUED

Related to:NO NAME SPECIFIED

Page: 3

## Incident / Investigation Report

*Mesa Police Dept.*

DR#: *2009-1320447*

**Officer's Narrative (continued)**

```
0     SEDAN, 4 DOOR - WHITE
VIN: UNKNOWN   License: UNKNOWN/UNKNOWN
```

Page: 4

FPD_ML-001890

## Incident/Investigation Supplement Report

Page: 1

**Agency:** MPD      **Case Number:** 2009-1320447

**Original Case Officer:** (14449) LANDER, V

| Supplement Date | Supplement Type | | Officer | |
|---|---|---|---|---|
| 05/18/2009 14:08:44 | INVESTIGATION | | (12196) WALTERS, B | |
| **Approving Officer** | **Date/Time** | | **Approving Supervisor** | **Date/Time** |
| (12196) WALTERS, B | 05/18/2009 14:09:12 | | (14369) SPICER, A | 05/18/2009 14:13:34 |

### SUPPLEMENT NARRATIVE

ON 05-12-2009 AT APPROXIMATELY 1300 HOURS, DETECTIVE ROBERTSON AND I WERE NOTIFIED BY SERGEANT SPICER OF A ROBBERY AT ▒▒▒▒▒▒▒▒ HOWEVER, AT THE TIME WE WERE WORKING AN UNRELATED ROBBERY AT A RESIDENCE IN A DIFFERENT AREA OF THE CITY. WE WERE TOLD THAT DETECTIVE VAN GALDER WAS GOING TO RESPOND AND COMPLETE THE INITIAL INVESTIGATION.

I LATER LEARNED THAT A BLACK MALE SUSPECT KNOWN AS "KB" CONTACTED (V) MATTHEW LLANEZA AT ▒▒▒▒▒▒▒▒ AND ROBBED HIM OF HIS LOADED AK-74 RIFLE. I WAS TOLD THAT MATTHEW KNEW KB FROM THE AREA AND IT WAS NOT UNUSUAL FOR HIM TO COME BY AND VISIT. ON 051209 AT 1139 HOURS, MATTHEW WAS IN HIS APARTMENT AND WAS CLEANING THE GUN, WHEN KB ARRIVED. DURING THE INCIDENT, KB ASKED TO SEE THE GUN. I WAS TOLD THAT KB FORCIBLY TOOK THE GUN AND MATTHEW ATTEMPTED TO KEEP THE GUN. A STRUGGLE ENSUED AND MATTHEW WAS ASSAULTED. MATTHEW BELIEVES KB STRUCK HIM WITH THE BUTT OF THE RIFLE. MATTHEW TOLD OFFICERS THAT KB FLED WITH THE LOADED RIFLE. KB FLED THE AREA IN A VEHICLE.

I WAS TOLD THAT (W) DARLENE BROWN WITNESSED KB ARRIVE AT THE APARTMENT. SHE HEARD MATTHEW YELL "GIVE ME THE GUN BACK!" AND SHE SAW KB RUNNING AWAY WITH MATTHEW'S RIFLE. DURING THE COURSE OF THE INVESTIGATION, DETECTIVES LEARNED KB'S IDENTITY TO BE KAREEM CALVIN BOWE ▒▒▒▒ ▒▒▒▒▒▒ A PHOTO LINEUP WAS CONSTRUCTED USING KAREEM'S PHOTO. MATTHEW LATTER IDENTIFIED THE PHOTO OF KAREEM AS THE PERSON HE KNOWS AS KB.

DETECTIVES IN THE MAJOR FELONY CRIMES UNIT WERE BRIEFED AND ATTEMPTED TO LOCATE KAREEM. ON 05-14-2009, I WAS NOTIFIED THAT KAREEM HAD BEEN LOCATED AND WAS TAKEN INTO CUSTODY. A SEARCH OF KAREEM REVEALED THAT HE HAD MARIJUANA ON HIS PERSON. THE MARIJUANA WAS LATER FIELD TESTED AS MARIJUANA. KAREEM WAS TRANSPORTED TO CENTRAL STATION FOR AN INTERVIEW.

UPON ARRIVAL, I WAS INFORMED THAT KAREEM WAS INVOLVED IN SEVERAL INCIDENTS IN AROUND THE AREA. I WAS TOLD THAT KAREEM WAS INVOLVED IN A SUBJECT DISTURBING CALL, THE ARMED ROBBERY INVESTIGATION, AND A THREATS CASE. KAREEM WAS ALSO AN INVESTIGATIVE LEAD ON A BURGLARY INVESTIGATION. BELOW IS A LIST OF THE RECENT INVESTIGATIONS.

| REPORT # | DATE/TIME | ADDRESS | CRIME |
|---|---|---|---|
| DR# 20091310652 | 051109/1801 | 1148 W. DRUMMER | SUBJECT DISTURBING |
| DR#20091320447 | 051209/1139 | 1146 W. DRUMMER | ARMED ROBBERY |
| DR#20091320550 | 051209/1349 | 1157 W. DRAGOON CIR | BURGLARY |
| DR#20091320783 | 051209/1843 | 1148 W. DRUMMER | THREATS |

I CONTACTED KAREEM AND CONDUCTED AN INTERVIEW ON HIM REFERENCE THE ABOVE LISTED REPORT NUMBERS. ON 05-14-2009, AT APPROXIMATELY 1506 HOURS, I READ KAREEM HIS MIRANDA RIGHTS. KAREEM STATED "YES, SIR" TO UNDERSTANDING HIS RIGHTS. THE INTERVIEW WITH KAREEM WAS RECORDED. BELOW IS WHAT KAREEM TOLD ME DURING MY INTERVIEW WITH HIM:

KAREEM CALVIN BOWE INTERVIEW -

-   KAREEM AND I DISCUSSED AN UNRELATED VERBAL AND PHYSICAL ARGUMENT BETWEEN HIM AND ANOTHER SUBJECT (DR #20091310652).

-   KAREEM AND I THEN SPOKE ABOUT THE INCIDENT BETWEEN HIM AND MATTHEW LLANEZA. KAREEM STATED HE DID GO OVER TO MATTHEW'S APARTMENT ON 05-12-2009. KAREEM SAID MATTHEW HAD A RIFLE OUT AND WAS TRYING TO SELL IT TO KAREEM.

-   KAREEM ADMITTED THAT HE TOOK THE RIFLE. ACCORDING TO KAREEM HE GRABBED THE RIFLE AND WAS GOING TO STEAL IT. HOWEVER, MATTHEW ATTEMPTED TO KEEP THE RIFLE. KAREEM EXPLAINED THE TWO WRESTLED OVER THE GUN AND HE ASSAULTED MATTHEW. KAREEM SAID HE THREW MATTHEW ONTO HIS HEAD AND FLED WITH THE RIFLE.

FPD_ML-001891

West Mesa J.P. COURT    [Precinct ____ ] MaricopaCounty, Arizona

| STATE OF ARIZONA    Plaintiff<br>-vs-<br><br>Kareem, C., Bowe<br>Defendant (FIRST, MI, LAST) | [CASE/COMPLAINT NO.]<br><br>20091320447<br><br>Booking No. ____ | RELEASE<br>QUESTIONNAIRE<br>(To be completed by<br>Law Enforcement) |

Alias(es)AKA   K.B.

(Check and explain where applicable)
**GENERAL INFORMATION**
Charges: ARS 13-1904A1 armed robbery, a class two felony (1
Count), ARS 13-2307A trafficking in stolen property a class two
felony (1 count), and ARS 13-3411A2 possession of marijuana.

Offense Date: 05-12-2009Offense Time:1139

Location: 1146 W. Drumer Ave. Mesa AZ 85210

Arrest Date: 05-14-2009Arrest Time: _1210_

Arrest Location: 2620 E. Maryland, Tempe, Arizona

**A.   PROBABLE CAUSE STATEMENT**

1.  Summarize and include the facts which establish probable
cause for the crime(s) charged. Certain felonies may be
non-bondable and require facts which establish proof
evident or presumption great for the crime(s) charged.
These include (1) felonies involving a capital offense, sexual
assault, sexual conduct with a minor who was under fifteen
years of age, or molestation of a child who is under fifteen
years of age, (2) any class 1, 2, 3, or 4 felony or any violation
of § 28-1383 if the person has entered or remained in the
United States illegally, and (3) felony offenses committed
when the person charged is already admitted to bail on a
separate felony charge.

Explain the crime(s) in detail (e.g., arresting officer or other
law enforcement officers witnessed offense, physical
evidence directly connects defendant to offense, multiple
eyewitnesses, defendant admissions, victim statements,
nature of injuries, incriminating photographic, audio, visual, or
computer evidence, defendant attempted to flee or resist
arrest):
On 05-12-2009 at approximately 1139
hours, the defendant robbed the victim
of his AK-74 rifle. The victim knew the
defendant and had several previous
contacts with him. During the robbery
the defendant used physically assaulted
the victim and took the loaded gun. The
victim believes he was struck by the gun
in his face, which caused his teeth to be
chipped. The defendant then fled the
area. A witness heard the altercation
and observed the defendant fleeing with
the rifle. The defendant was later
identified via photo lineup by the victim.
On    05-14-2009,    the    defendant's
whereabouts were located. When the
police arrested the defendant, he had
marijuana on his person. A field test

later positively identified the substance
as Marijuana.
During a post Miranda interview the defendant admitted the
Marijuana as being his and previously smoking it. The
defendant also admitted to having a physical altercation with
the victim and stealing his rifle. According to the defendant,
he sold the rifle to an unknown subject for $250 dollars.

APPROVED BY SGT.
PER D. BOONE #12351

Form 4(a) 1 of 4
Rev. 06/07

FPD_ML-001903

2009/320447

2. The person entered or remained in the United States illegally. Explain in detail (e.g., admission by the person, statements of co-defendants at the time of arrest, verification of illegal presence or proceeding establishing illegal presence): N/A

3. The crime(s) occurred while the person was admitted to bail on any separate felony. Provide information on the separate felony: N/A

C. **OTHER INFORMATION**

1. Defendant is presently on probation, parole or any other form of release involving other charges or convictions. Explain: Currently on probation for a previous domestic violence incidnet.

Form 4(a) 2 of 4
Rev. 06/07

FPD_ML-001904

# EXHIBIT D

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

**Scott Lines, Ph.D.**
*Licensed Psychologist  PSY 14167*
**2415 Webster Street, Berkeley, CA 94705**
**510.644.2396 (phone & fax)**

**Psychological Evaluation**

| | |
|---|---|
| **Subject of Evaluation:** | Matthew Aaron Llaneza  4 13 70148 MAG |
| **Date of Birth:** | 03-18-84 |
| **Date of Interview:** | 07-29-13 |
| **Date of Report:** | 08-05-13 |
| **Referred by:** | Jerome Matthews, Assistant Federal Public Defender |

**Reason for Evaluation**

Assistant Federal Public Defender Jerome Matthews requested a second psychological evaluation of his client, Matthew Llaneza, to determine his present competency to understand the nature of the legal proceedings he is facing, to assist his counsel in defending him, and to enter a plea of guilty to the charges if he wishes to do so.  In addition to addressing his competency, I was asked to address the question of whether Mr. Llaneza manifested a high degree of suggestibility while in the manic phase of his bipolar disorder.  I interviewed Mr. Llaneza previously in late February 2013 in conjunction with a full psychological evaluation, dated March 4, 2013, and at that time found him to be competent to stand trial.  This second competency evaluation was requested because of concerns having been raised as to his current mental state.

**Procedures**

After conversing with his attorney on 07-17-13, I conducted a clinical interview with Matthew Llaneza for two hours at the Santa Rita jail on 07-29-13.  At the start of the interview, I again explained the limits of confidentiality in this forensic interview; he understood these limits and agreed to be interviewed.  No documents were reviewed in this brief evaluation.

**Appearance and Mental Status**

I interviewed Matthew Llaneza in a contact interview room at the Santa Rita jail for two hours on July 29, 2013.  He had shaved the slight beard he wore in February, but otherwise his appearance was similar to our last interview, a slightly built, light-skinned Hispanic American man with short brown hair and no obvious tattoos.  As before, he greeted me with a friendly demeanor, maintained good eye contact while speaking but looked away when silent.  He wasn't sure of the day of the week, stating that in isolation he tends to lose track of the days; he knew it was late July.  He answered questions forthrightly and with little hesitation, but did not initiate conversation.

Matthew stated he was on the psychotropic medications Xyprexa, an atypical anti-psychotic; Zoloft, an anti-depressant; propranolol, a beta-blocker used to treat anxiety and minimize the side effects of other medications; and Benadryl, a sleeping medication; and another medication he could not name.  In the previous interview he had been taking

Depakote, a mood stabilizer; he stated this medication was discontinued a few months ago because of tremors. I asked him what difference, if any, he noted in being off the Depakote. He stated he had noticed that he had more high moods and stated as follows:

> I'll find myself doing weird stuff, messing around, doing crazy stuff, shutting people's window slots, messing with people. People convince me to do stuff, like "Hide this razor," and I'll do it. Or cooking alcohol for people, but I don't even like alcohol. Then purposely spill it around so the deputies have to do a shakedown. I did that because I thought it was fun. When I'm not manic, I just think it's stupid.

In this interview, he did manifest a slightly elevated mood with mild flight of ideas. He described himself as trending toward "going up" in his mood, noticing himself laughing more and banging on others' cell doors. However, his judgment appeared relatively unimpaired in our discussion and he did not appear to be suffering from overt psychotic thought process. He did report having strange experiences while in an elevated mood state. For instance, he described being put in an isolation cell during a recent cell search and hearing what he described as "whispers" coming from an overhead speaker, which he thought was evidence that someone was doing some kind of "psy-op" on him to get him to break. He did not appear depressed. His memory appeared unimpaired.

As before, Mr. Llaneza appeared neither to overstate his symptomatology nor to understate his involvement in the alleged offense conduct. As such, it is my opinion that this man truthfully participated in this interview and did not try to manipulate nor shape my clinical impression of him in any way.

**Mental Competency to Understand Legal Proceedings and Assist Counsel**
I once again asked Matthew Llaneza a number of questions in order to evaluate his mental competency to understand the nature of the criminal proceedings against him and his ability to assist counsel in the conduct of a defense, and to enter a guilty plea.

Understanding the Nature of the Criminal Proceedings
Matthew Llaneza was able to describe the layout of the courtroom, the personnel associated with a trial, and his right to testify or not testify. He understands that, should he decide to go through the plea bargain process, he will give up his constitutional rights to a trial and will go to federal prison. He expressed his feelings that, working with his attorney, he might get a better outcome through a plea bargain than by going to trial, but that he could interrupt a plea bargain process and go to trial, should he decide to do so. He demonstrated an understanding of what a plea bargain is. He stated, "I understand we're in a plea bargaining process." Asked what that means, he said, "They try to negotiate a sentence before going to court." He understood the negotiators to be, "Everyone, my lawyer, the DA." When asked what would happen if he entered into a plea bargain, he said, "A sentence or probation, I don't think you have a trial." He stated that outcome would be preferable to him if he got a better sentence than if he went to trial.

Ability to Assist Counsel in the Conduct of his Defense

Matthew Llaneza once again demonstrated the ability to consult his lawyer in order to determine the best course of action to take on his case. He could name his lawyer as Jerome Matthews, Assistant Federal Public Defender, and stated he had confidence in his attorney. He understood that he advises his attorney regarding what outcome he would like, and that his attorney negotiates with the DA and the judge. He said, "We go back and forth and if I don't accept their offer I have to go to trial." He stated that he would accept or reject an offer based on advice from his attorney. He planned to cooperate with his lawyer and take his advice regarding which strategy to follow. He expressed his opinion that accepting the government's offer of a reduced sentence might be a good strategy, but he also recognized that he could change his mind and go to trial.

**Summary of Competence Findings**

My opinion in this evaluation regarding Mr. Llaneza's competency to stand trial is that he is competent to participate in his own defense, that he understands the nature of criminal proceedings and that he has the ability, willingness and presence of mind to assist his attorney in defending him in a reasonable and logical manner. As with the previous psychological evaluation, this evaluation does find Mr. Llaneza suffering from a serious mental illness. However, this condition does not render him incompetent to understand his legal situation and participate with his counsel in mounting a defense against the charge he is facing. As such, I find him mentally competent to understand his legal situation and to assist his attorney in his defense.

**Evidence of Suggestibility**

Matthew Llaneza made several statements that provide evidence of his high degree of suggestibility when experiencing elevated mood. He made these statements spontaneously while we were talking about his behaviors during his mood elevations; to my knowledge, Matthew Llaneza was unaware that one purpose of this brief evaluation was to assess his level of suggestibility. Thus, I took his statements to be valid evidence of his suggestibility, not as evidence of an effort to manipulate the interview to gain an advantage in the legal proceedings he faces.

As previously stated, he found himself cooking alcohol at the suggestion of other inmates, even though he has little interest in drinking alcohol himself, then spilling it around his immediate environment to rattle the deputies and create a "shakedown." He related this behavior as being similar to times in Arizona when he would buy alcohol for immigrants for pay, even though he knew he might get in trouble for this. He stated that once, while manic and using cocaine, he contemplated the idea of bringing lions and tigers to the desert area around Mesa, Arizona, so that they would breed and "make trouble." While an idea such as this excites him when he's manic, he finds it crazy when his mood is more suppressed.

These are clear manifestations of the irrational flight of ideas found in the typical manic episode. Similarities exist between these bizarre ideas and the irrational thought processes found at the root of his alleged offense conduct. An idea occurs to him, or in the case of his alleged offense conduct, is offered to him, and when he is manic the

irrational idea conforms to the desire to stimulate chaos and disorder, reflective of the chaos and disorder he feels while under the sway of his mental disorder. In addition, his mental disorder also makes it hard for him to maintain steady employment due to his mood swings, rendering great occupational and economic instability. This, in turn, makes him easily susceptible to financial or other compensatory manipulation, as in the case of buying alcohol for illegal immigrants for compensation.

He stated regarding his alleged offense conduct that he was offered food, clothing and access to medical marijuana, which he lost legal access to with his previous felony charge. He stated, "When they asked me to meet the one to do the bombing, I felt more compelled because they helped me out." He also stated his understanding that he would be sent to Afghanistan, even though he questioned the sense of this, and that once he helped his co-conspirators, he would be "given a field of weed." In other words, it was the false promise of being gifted with a life of ease and ready access to marijuana, which he has found helpful in managing his mood swings, that influenced him to engage in the alleged offense conduct, rather than any deep-seated criminal or terrorist leanings.

**Summary of Findings**
Matthew Llaneza is competent to stand trial. He demonstrated a good understanding of the legal situation in which he finds himself, and good understanding of the legal proceedings he faces. He possesses adequate knowledge of his rights and responsibilities as a defendant in a criminal proceeding. He understands the roles of defendant, defense attorney, prosecuting attorney, judge and witnesses, and understands his various rights regarding pleading.

Matthew Llaneza is highly susceptible to manipulation when he is in the manic phase of his disorder, for two reasons. First, he will seek exciting, stimulating activities that feel concordant with his manic mood. Second, when his bipolar illness is not adequately treated, as was the case during the time period encompassing his alleged offense conduct, his disability renders him unable to sustain and keep meaningful employment. This, in turn, leads to him being easily manipulated by the promise of economic reward for behavior that, when not manic, appears irrational and holds no interest for him.

It is my clinical opinion that these forces—susceptibility to manipulation and economic need—were sufficient to produce impaired judgment and diminished mental capacity to prevent himself from engaging in the alleged offense conduct. Further, it is my opinion that if Matthew Llaneza had been given adequate psychological and pharmacological treatment during the time period encompassing his alleged offense conduct, he would not have incurred the current charge against him.

Diagnostic Impression: (DSM-IV-TR)
Axis I:         Bipolar I Disorder, in partial remission
                Posttraumatic Stress Disorder, chronic
                Cannabis Abuse, in remission, controlled environment
                Alcohol Abuse, in remission, controlled environment
Axis II:        No diagnosis

Axis III:     None known

Axis IV:     Problems with family and other support group; legal problems

Axis V:     Global Assessment of Functioning:   Current = 50

                                                     Estimated previous 3 months = 35

**Recommendations**

Matthew Aaron Llaneza currently requires close monitoring for psychotropic medication compliance and efficacy of treatment. In particular, his medication regimen should be adjusted to include an adequate mood stabilizer, in addition to the anti-psychotic and anti-depressant medication he currently takes. Such adequate pharmacological treatment in conjunction with psychotherapy would go a long way toward minimizing this man's dangerousness, whether in or out of custody. He will require this treatment regardless of the legal disposition in the current case. He would also benefit from regular substance abuse treatment.

I hope this evaluation will help you in your legal representation of this interesting man. Please do not hesitate to contact me if I can clarify any aspect of this report.

Sincerely yours,

Scott Lines, Ph.D.
Clinical Psychologist
PSY 14167

# EXHIBIT E

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification:
Source Id:
Date:                           2011-01-24
Case Agent Name:                Dimachkie,Maher M.
Field Office:                   San Francisco
Squad:

Date of Contact:                2011-01-16
Participants/Witnesses:         SA Dimachkie          ALL INFORMATION CONTAINED
                                                      HEREIN IS UNCLASSIFIED
                                                      DATE 04-25-2013 BY 60T91S062 TSICG
Type of Contact:                                      Per CTD redactions request dated 3-11-13
Location                        Telephonic
Country:
City:
State:
Date of Report                  2011-01-24

Substantive Case File Number:        -SF-137936

Source Reporting:

On Sunday, January 16, 2011, San Francisco CHS reported that Tariq
LNU, aka AL Talivan, has been attempting to contact SF CHS, who in turn
informed him that the brothers are unhappy because he never showed-up for
the meeting at Sky Harbor International Airport on January 13, 2011.
Tariq LNU told the CHS that he did not show-up to the meeting because he
noticed that he was being followed and did not want to risk compromising
the CHS identity by leading them to the CHS.

The CHS told him that he agrees with the decision not to show-up and
praised Tariqs good judgment and quick thinking. The CHS told Tariq that
he would talk to the brother to see about giving Tariq another chance.

ML-0421

DECLASSIFIED BY C070146869 NSICG
ON 04-04-2013

~~SECRET~~//NOFORN//25X1 - HUMAN     Per CTD redactions request dated 4-2-13

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification:              ~~SECRET~~//NOFORN//25X1 - HUMAN
Source Id:                        ███
Date:                             2011-12-13
Case Agent Name:                  Karem,Zachary E.
Field Office:                     San Francisco
Squad:                            ███

Date of Contact:                  2011-12-12
Participants/Witnesses:           Zachary E Karem


Type of Contact:                  In Person
Location
Country:                          UNITED STATES
City:                             Campbell
State:                            California
Date of Report                    2011-12-13

Substantive Case File Number:     ███-SF-147783

Source Reporting:


(U) A Confidential Human Source (CHS), who is willing to
testify, provided the following information:


(U)·⊠ CHS says that although LLANEZA is a fast learner, he doesnt
really talk much. CHS stressed that, if he didn't start
conversation, LLANEZA would just sit in the truck and not say
anything. CHS said that even if we didnt task him to work with
LLANEZA, that he would consider hring him on his own. He says
that LLANEZA does whatever he tells him to do and that he 'goes
under houses no problem'.


(U)·⊠ LLANEZA complains to the CHS that his dad is always
'screaming and yelling' at him. LLANEZA described one particular
situation in which he was using a computer and his father asked

ML-0439

FD-302a (Rev. 05-08-10)

SECRET//ORCON/NOFORN

-SF-147783

VERBATIM TRANSCRIPT (MATTHEW AARON
Continuation of FD-302 of LLANEZA) _____ , On 11/30/2012 , Page 53 of 60

<12:28:06>

MAL: They got [UI...]

UCE: [UI...............]. The truth is, that's . . . that's the one thing they have. [UI] technology.

MAL: Yeah.

UCE: I know [UI] . . . I know that it [UI...] but your plan is [UI] to fail the attack is [UI].

MAL: Yeah.

UCE: You better say no [UI] you may get caught and because I am one of the few Brothers that travels [UI] Afghanistan and back to America [UI] we have our [UI]. I don't think my [UI] will let me get [UI....]. [UI] gonna say no [UI] so I don't think they'll let me do a failed [UI]. [UI....] evidence, they're gonna find it. I don't [UI..]. It's too much. The risk is too high.

MAL: All right. You're right.

UCE: They're gonna find evidence, they'e gonna find [UI], they're gonna find clothing. They'e gonna find so much. [UI] find a [UI]. I like your plan, though [UI....], and I like your plan [UI..] if, if it's a bank, [UI] bank [UI], right because they need a banking system.

<12:29:34>

MAL: We can do the Federal Reserve pretty easy if someone from Shabib(phonetic).

UCE: [UI] I don't want you [UI] Shabib. I don't want you to become [UI] . . . I . . . I . . . I [UI] to be here [UI] take [UI].

MAL: Yeah. Me! I have . . . I have [UI].

UCE: I don't want you to become [UI]. I, I, I check [UI]. you won't . . . you won't continue [UI]. Not, not here. Shabib is only when you have no other options [UI], right? If you have no other way of doing it, then Shabib [UI......] the Federal Reserve but not [UI]. [UI.................].
[UI]. This is . . . this is all I have [UI], and [UI] how my name on [UI....] always [UI....].

MAL: [UI] has a name, my name [UI].

SECRET//ORCON/NOFORN

ML-1541

# EXHIBIT F

U.S. v. Matthew Llaneza,
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

jailed for six months because he brought an assault weapon to California and
was caught with it and 30-round magazines.When CHS asked LLANEZA why he brought
the assault weapon to California, LLANEZA replied that he did not know it was
illegal to have such a weapon in California since it was legal in Arizona where
he bought it.LLANEZA told CHS that he met with his probation officer weekly on
Monday and asked not to work on those days.

(U//LES) LLANEZA mentioned some details about his family.His mother was in
Arizona, while his father, stepmother and half brothers lived in San Jose.LLANEZA was staying with them now.

(U//LES) LLANEZA told CHS that he had converted to Islam in 2004 at a mosque in
San Francisco.LLANEZA was not going to any mosque at the moment, because he did
not want any problems.LLANEZA believed that lots of people at the mosques worked for the FBI and CIA and might report him to them.LLANEZA commented that
'National Security' was after him because he was a Muslim convert who liked to
collect weapons.He was no longer interested in collecting weapons and wanted to
stay out of trouble.

(U//LES) CHS promised to call LLANEZA on Friday morning, 11/25/2011, if he was
needed that day.Otherwise, CHS would pick up LLANEZA Tuesday morning, 11/29/2011, for another full day of work.

SECRET//25X1 - HUMAN

DECLASSIFIED BY C07G16D62 DSICG
ON 04-03-2013

~~SECRET~~//NOFORN//25X1 - HUMAN          Per CTD redactions request dated 4-2-13

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification:            ~~SECRET~~//NOFORN//25X1 - HUMAN
Source Id:                      ███████
Date:                           2011-12-21
Case Agent Name:                Karem,Zachary E.
Field Office:                   San Francisco
Squad:                          ███

Date of Contact:                2011-12-16
Participants/Witnesses:         SA Zachary E. Karem████████
███

Type of Contact:                In Person
Location
Country:                        UNITED STATES
City:                           Campbell
State:                          California
Date of Report                  2011-12-19

Substantive Case File Number:   ███-SF-147783

Source Reporting:

(U) A Confidential Human Source (CHS), who is willing to
testify, provided the following information:

(U) ███ While driving to and from worksites, LLANEZA boasts on his
ability to make bombs. According to the CHS, LLANEZA has stated
that he knows how to build a bomb 'from scratch'. LLANEZA went
into exact details about bomb building and says he knows how to
utilize a cellular phone as a trigger mechanism. Furthermore,
LLANEZA says that he has been building bombs since he was a
child. CHS says that the last time LLANEZA built a bomb and
detonated it was when he was a child in Arizona. However,
LLANEZA always rebuts his boasts by saying he wants to stay away
from weapons and explosives in accordnace with his probation.

ML-0441

(U) ⌧ LLANEZA continues to brag about his knowledge of 'AK' style weaponry. He has complained about the gun laws in Claifornia stqating that they are too restrictive.

(U) ⌧ During a particular work-day, CHS stopped by a liquor store in order to pick up some things for himself. LLANEZA went into the store but then ran out. He later said that he was afraid of violating his probation. According to the CHS, LLANEZA is looking into taking college courses at a local community college. They are basic 100 level courses and they are being taught on Tuesday's and Thursday's.

(U) ⌧ CHS continues to believe that LLANEZA will convert back to christianity. CHS believes that he is under a significant amount of pressure from his family. At this point, CHS believes there is a 90 probability that LLANEZA will convert back.

SECRET//NOFORN//25X1 - HUMAN

ML-0442

(U//LES) CHS stated that LLANEZA is getting along well with his dad and that the medication that he has been taking is effective. CHS believes that LLANEZA still trusts him '100'.

(U//LES) LLANEZA told the CHS that during his last probation meeting that they brought in an ex-Marine to talk to him. LLANEZA said that the ex-Marine asked all kinds of 'wierd questions' and that since that time, he has stopped praying (note: the ex-Marine was SA Karem sitting in on the probation meeting under the ruse of being a probation officer).

(U//LES) CHS and LLANEZA continue to talk about the 'AK' family of weapons. LLANEZA has been talking about how he used to go and shoot guns in the Arizona desert all the time. He said at one point he owned armor piercing bullets. However, LLANEZA went on to say that he no longer owns them.

(U//LES) CHS says that he still will sometimes push LLANEZA to go to a shooting range with him, but LLANEZA always says that he cant because of his probation. CHS opines that between medication and school, he doesnt have time to think about weapons.

(U//LES) CHS thinks there is a 95 chance that LLANEZA will convert back to christianity. He thinks he still may hire LLANEZA even if agents stop paying him.

SECRET//NOFORN//25X1 - HUMAN

SECRET//NOFORN//25X1 - HUMAN

DECLASSIFIED BY C91D16842 MSICG
ON 04-05-2013

Per CTD redactions request dated 4-2-13

FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

Form Classification:          SECRET//NOFORN//25X1 - HUMAN
Source Id:                    ███
Date:                         2012-01-26
Case Agent Name:              Karem,Zachary E.
Field Office:                 San Francisco
Squad:                        ███

Date of Contact:              2012-01-26
Participants/Witnesses:       SA Zachary E Karem  ███████
███


Type of Contact:              In Person
Location
Country:                      UNITED STATES
City:                         Campbell
State:                        California
Date of Report               2012-01-26

Substantive Case File Number:    ███-SF-147783

Source Reporting:


(U) A Confidential Human Source (CHS), who is willing to
testify, provided the following information:


(U) ☒ CHS reported that LLANEZA is still attending vocational
school on Tuesdays and Thursdays from 5pm until 9pm. Also,
mandatory probation meetings for LLANEZA have been cut back to
two days a month vice four days a month.


(U) ☒ According to the CHS, LLANEZA seems 'harmless' and that his
main concern is doing everything he can to stay out of jail.
There conversations in the CHS vehicle still revolve mainly
around 'AK' style assualt weapons.

(U) ⊠) <mark>If LLANEZA wanted to go and hurt other people, CHS believes that he would know.</mark>

(U) ⊠) CHS believes that LLANEZA 'probably' misses his weapons 'hobby'. Also, LLANEZA misses Arizona and has not expressed desire to go anywhere else.

(U) ⊠) CHS believes that LLANEZA is acquiring the skills to build a career for himself. LLANEZA has shown good initiative and continues to improve. However, LLANEZA could not currently work as a plumber independantly. CHS opines he could work as day laborer and that is about it.

(U) ⊠) LLANEZA has not spoken of recieving disability payments, but he has mentioned trying to get into section 8 housing. CHS believes that LLANEZA lacks the capability to live on his own. What LLANEZA primarely needs to develop himself is more work.

(U) ⊠) LLANEZA's life currently consists of working, sleeping, and using the computer at his fathers house.

(U) ⊠) LLANEZA has never called in sick and is 'very responsible' when checking in with his probation officer.

(U) ⊠) CHS has never felt that his life is in danger around LLANEZA.

(U) ⊠) CHS believes that he is a good influence on LLANEZA and that he works to maintain only 'positive influences' around his worksites.

ML-0449

# EXHIBIT G

<u>U.S. v. Matthew Llaneza,</u>
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

Title: ██████ MEETING SUMMARY - 1/12/2013
Re: ██████SF-147783, 01/21/2013

facility had too many cameras and too much security. The UCE added that he had learned from LLANEZA to look for cameras. LLANEZA then commented that there were cameras on the back route they had selected. The UCE asked if LLANEZA wanted to take a different route. LLANEZA said he was unsure. The UCE then asked LLANEZA what time he wanted to do the bombing. LLANEZA replied that they had a short window between 2 and 3 am since people started coming to work around 4 am. LLANEZA wanted to avoid killing people unnecessarily. The American militias were weak, even though they had more training. LLANEZA did not want to harm their recruiting or for them to find out it was LLANEZA and the UCE behind the bombing. The UCE reassured LLANEZA by saying they would disappear afterwards.

(U) ██████ The UCE and LLANEZA turned into the parking lot of the Public Storage facility at 1639 Whipple Road, Hayward, California. LLANEZA asked the UCE how he had driven the car back from Los Angeles when he already had the car he was driving. The UCE explained to LLANEZA that a brother picked him up at the storage unit and drove him to the airport. LLANEZA noted that the facility was owned by the same company as the first one. He thought this was strange. The UCE reassured him saying the facility was older and had less security than the other one. At approximately 8:38 am, they parked inside the facility on the back side of Building C next to the rear entrance to storage unit #2. As they pulled up, LLANEZA commented to the UCE that he was getting a chance to see the car and could not wait to drive it. The UCE and LLANEZA exited the car. The UCE unlocked the rear door and they entered the storage unit. As the UCE disabled the alarm, he told LLANEZA that he had asked a brother to install an alarm on the unit. If the alarm went off, they would know something was wrong. The UCE and LLANEZA then moved over to the rear hatch of the 2012 Mazda CX7 SUV parked in the front part of the unit. The UCE opened the hatch and pointed out to LLANEZA where the bomb would go and how one could not see through the tinted windows. LLANEZA laughed, turned towards the UCE, shook his hand and then gave him a one-armed hug. They then walked around the car to the hood. The UCE pointed out that the car had no license plates and was still bearing a dealer plate. He explained to

5

ML-0310

# EXHIBIT H

<u>U.S. v. Matthew Llaneza,</u>
CR 13-00145 YGR
DEFENDANT'S SENTENCING
MEMORANDUM AND MOTION FOR
DOWNWARD VARIANCE

Case 4:13-cr-00145-YGR   Document 30-1   Filed 02/21/14



**The New York Times** | http://nyti.ms/1h6kqOG

N.Y. / REGION

# Man Pleads Guilty to Reduced Charge in Terrorism Case

By JAMES C. McKINLEY Jr.    FEB. 19, 2014

Five days before his trial was to start, a Manhattan man accused of planning to wage a personal jihad against the United States with pipe bombs pleaded guilty on Wednesday to reduced charges in a deal with prosecutors.

The man, Jose Pimentel, was facing state terrorism charges for building an inexpensive pipe bomb in an informer's apartment, and starting to work on two others, according to an indictment. Prosecutors said they had evidence that he meant to detonate bombs in New York City in retaliation for the death of Anwar al-Awlaki, a radical Muslim cleric in Yemen.

But on Wednesday, Mr. Pimentel appeared in State Supreme Court in Manhattan to plead guilty to a single count of attempted criminal possession of a weapon in the first degree as a crime of terrorism. As part of the plea deal, he agreed to serve 16 years in prison and five years of probation when he is sentenced on March 25; he had faced 15 years to life in prison under the original charges of weapons possession and conspiracy as crimes of terrorism.

Mr. Pimentel's lawyers had contended that their client was entrapped by the police. They describe him as a down-on-his-luck young man who was easily enticed by the informer to build bombs after being plied for months with free food and marijuana.

One of the defense lawyers, Susan Walsh, said Mr. Pimentel had decided it was not worth risking an even lengthier prison term on the hopes that the defense team could prove that Mr. Pimentel had been lured into making the bomb. "The

Case 4:12-cr-00045-YGR Document 30-1 Filed 02/21/14 Page 38 of 39

fundamental question that will not be answered, at least in the court of law, is who exactly is recruiting whom in this war on terror," Ms. Walsh said outside court.

Mr. Pimentel, 29, manacled and dressed in an orange jump suit, seemed calm as he changed his plea to guilty before Judge Thomas Farber. He wore wire-rim glasses, a short cropped beard and a black Islamic skullcap, giving him a professorial air.

Judge Farber said the plea agreement was a three-page document that included a signed admission by Mr. Pimentel. In that admission, the defendant admitted he had built a pipe bomb with an informer named Abdul in November 2011, after getting the instructions from Inspire magazine, an online jihadist publication. In the letter, he said he intended to set off the bombs "to undermine the support of the wars in Iraq and Afghanistan."

Deborah Hickey, the assistant district attorney handling the case, said the state had evidence that Mr. Pimentel intended to attack returning soldiers, Army recruitment offices, police officers and Jews. Ms. Hickey said the sentence was appropriate, because it was more than the minimum he might have received had a jury convicted him on the top count of the indictment.

Mr. Pimentel, a Dominican native who converted to Islam, was arrested in November 2011 after a lengthy investigation. The arrest stemmed from a sting operation by the Police Department's Intelligence Division. The police used an undercover officer, two confidential informers and hundreds of hours of recorded conversations.

The case in state court was unusual because the federal authorities typically handle terrorism prosecutions. But the Federal Bureau of Investigation, which had monitored Mr. Pimentel, decided not to pursue charges against him, and the Manhattan district attorney, Cyrus R. Vance Jr., took on the task.

No evidence has been produced in court that Mr. Pimentel had co-conspirators or was taking instructions from terrorist organizations abroad. He has been described as a lone wolf.

At a news conference, Police Commissioner William J. Bratton said Mr. Pimentel was typical of the homegrown, self-made terrorist that organizations like Al Qaeda had tried to inspire through jihadist websites and anti-Western propaganda. "This young man really was self-radicalized," Mr. Bratton said.

The 16-year sentence that Mr. Pimentel had accepted was in line with what many similar defendants in federal cases have received, Mr. Vance said. He said the evidence against Mr. Pimentel — tape recordings of him plotting to bomb cars and police station houses — was "rock solid," even though it was gathered by a confidential informer who repeatedly smoked marijuana with the defendant.

"We always wish in all our cases we might have priests or rabbis as our key witnesses," Mr. Vance said. "But that isn't life."

Mr. Pimentel is the third person to be charged under New York's antiterrorism law, passed in the wake of the Sept. 11 attacks. Though the statute was never employed under the previous Manhattan district attorney, Mr. Vance has now used it twice.

The first convictions came in spring 2013, when Ahmed Ferhani was sentenced to 10 years in prison and Mohammed Mamdouh received five years. Both men had pleaded guilty in a plot to bomb Manhattan synagogues.

Mr. Vance defended the investigation that led to Mr. Pimentel's arrest, saying it illustrated how local police officers and prosecutors can defuse terrorist plots before they are carried out. "The most important aspect of this case is not what happened but what didn't," he said. "Our capacity to find the terrorist threat — to see the dots, if you will — and prevent an attack from occurring will always be a better outcome than prosecuting a case after an attack has occurred."

*Correction: February 19, 2014*
*An earlier version of this article misstated the given name of one of Mr. Pimentel's defense lawyers. She is Susan Walsh, not Mary.*

*Correction: February 19, 2014*
*An earlier version of this article misstated the surname of a radical Muslim cleric who was killed in Yemen. He is Anwar al-Awlaki, not al-Awaki.*

A version of this article appears in print on February 20, 2014, on page A18 of the New York edition with the headline: Manhattan Man Set for Trial in Terror Case Pleads Guilty to Reduced Charge.

© 2014 The New York Times Company