MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

ANDREW P. CAPUTO (CABN 203655)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7004
    FAX: (415) 436-7234
    andrew.caputo@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MATTHEW AARON LLANEZA,<br><br>    Defendant. | No. CR 13-0145 YGR<br><br>SENTENCING MEMORANDUM<br><br>Date: February 27, 2014<br>Time: 2:00 p.m. |

Defendant Matthew Aaron Llaneza has pleaded guilty to a single-count indictment charging him with attempted use of a weapon of mass destruction against property used in interstate commerce, in violation of 18 U.S.C. § 2332a(a)(2)(B). His guidelines sentencing range is 360 months to life. He entered his guilty plea pursuant to a Rule 11(c)(1)(C) plea agreement that provides for a sentence of 180 months in custody followed by supervised release for life. The probation office concurs with the sentence specified in the plea agreement. The United States respectfully asks the Court to sentence defendant to 180 months in prison, a lifetime of supervised release, and a $100 special assessment.

**FACTS**

Defendant drew the attention of the Federal Bureau of Investigation ("FBI") in late 2010 when he made statements, initially online and later in conversations with an informant, indicating an interest in engaging in violent jihad within the United States. During meetings in March 2011 with the informant, whom Llaneza perceived as interested in violent jihad against the United States, Llaneza asserted his support for the Taliban and Al Qaeda and claimed experience in guerilla warfare, building explosives, and creating mayhem. He offered to acquire weapons, rob banks, and kill people. Some of his claims of experience and plans for action seemed to be fantastical or simply infeasible. Presentence Report ("PSR") ¶¶ 6-11.

The following month, in April 2011, defendant was found in possession of an AK-47 assault rifle and three loaded, 30-round magazines. He was arrested and ultimately convicted in Santa Clara County Superior Court of transportation of an assault weapon and possession of a high capacity magazine. He was sentenced to one year in prison and released from custody in November 2011. Id. ¶¶ 12, 39.

The combination of Llaneza's statements of intention to engage in violent acts and his possession of an assault rifle with nearly 100 rounds of ammunition caused concern within federal law enforcement. The FBI was aware that Llaneza suffered from mental health issues. It took steps to increase the mental health treatment resources available to him and his family. E.g., id. ¶¶ 13, 59. It also sought to create opportunities for him to move voluntarily down a peaceful path by introducing him to positive, non-violent influences. None of these efforts met with success, as Llaneza continued to make statements indicating a desire to engage in violent jihad.

On November 30, 2012, at the FBI's covert initiative, Llaneza met with a man who led him to believe he was connected with the Taliban and the mujahidin in Afghanistan. In reality, this man was an undercover FBI agent. At this initial meeting, Llaneza proposed conducting a car-bomb attack against a bank in the San Francisco Bay Area. He proposed structuring the attack to make it appear that the responsible party was an umbrella organization for a loose collection of anti-government militias and their sympathizers. Llaneza's stated goal was to trigger a governmental crackdown, which he expected would trigger a right-wing counter-response against the government followed by, he hoped, civil war. Llaneza identified the Federal Reserve Bank in San Francisco or, alternatively, an unspecified local bank

as potential targets for the attack.  Id. ¶¶ 14-15.

At the next meeting between Llaneza and the undercover agent, on December 7, 2012, Llaneza altered his original idea of the Federal Reserve Bank as the target of the attack, saying he thought there would be too much security around that site.  He proposed instead that the men bomb a Bank of America branch in Oakland, reasoning that the name of the bank and Oakland's location as a center of protests made it an appropriate target.  The men developed a plan to construct a car bomb.  Llaneza offered to purchase chemicals and other items necessary to construct the device.  Id. ¶ 16.  In order to ensure the protection of the public, the FBI made sure that the bomb was inert and could not explode.

The next meeting between Llaneza and the undercover agent occurred a week later, on December 14, 2012.  During the meeting Llaneza researched the location of Bank of America branches and selected as the target the Bank of America branch located at 303 Hegenberger Road in Oakland.  While viewing aerial imagery of the bank and its surroundings, Llaneza specified possible locations for the car bomb to be detonated and for Llaneza and the undercover agent to position themselves when they detonated the bomb.  Llaneza specified a spot next to a support column of the bank building as a good location for the bomb, expressed a desire for the bomb to bring down the entire bank building, and offered to drive the car bomb to the bank at the time of the attack.

On December 23, 2012, Llaneza and the undercover agent drove to 303 Hegenberger Road and surveilled the location.  Llaneza again stated that he would drive the car bomb to the attack and repeated his goal of collapsing the entire bank building.  As the men drove around the area, Llaneza confirmed the car-bomb location and the location from which the men would detonate the bomb.  He stated he would dance with joy when the bomb exploded.  He also specified a time for the attack of between 2:00 a.m. and 4:00 a.m., in order to avoid unintended casualties.  As the men later drove south on Interstate 880, Llaneza pointed out a storage facility in Hayward located next to the highway.  He suggested obtaining a storage unit at the facility, where the men could assemble the bomb.  The FBI subsequently rented a storage unit at a facility near the one Llaneza pointed out and positioned a sport utility vehicle ("SUV") in it for use as the delivery vehicle for the car bomb.  Id. ¶ 17.

Llaneza and the undercover agent returned to the storage unit on January 12, 2013.  As the men drove there, Llaneza offered to travel to Afghanistan to train Taliban fighters and said he wanted to go to

Afghanistan as quickly as possible after the attack on the bank. With the undercover agent, he developed a plan to travel to Pakistan by ship after the attack and from there to Afghanistan. He again suggested timing the bombing for early in the morning, between 2:00 and 3:00 a.m., in order to avoid killing people unnecessarily. Inside the storage unit, upon viewing the rear compartment of the SUV, where the bomb would be placed, Llaneza laughed and hugged the undercover agent. Id. ¶ 18.

On January 26, 2013, Llaneza and the undercover agent loaded twelve five-gallon buckets into the SUV. Each bucket contained chemicals that had been obtained and prepared by the FBI to simulate an explosive mixture. In response to inquiries by the undercover agent, Llaneza assured the agent he was "ready to go" and felt no pressure from anyone to proceed with the attack. Llaneza agreed to purchase two cellphones for the car bomb's remotely operated trigger device, along with an LED light, a nine-volt battery, and a battery snap cap for use in constructing the device. After completing their work in the storage unit, the men drove to Milpitas, where Llaneza purchased the two cellphones for the trigger device and gave them to the undercover agent. The FBI subsequently constructed the trigger device using one of the cellphones. As further described below, the other cellphone was used by Llaneza at the time of the attack to call the cellphone in the trigger device and, Llaneza believed, detonate the bomb. Id. ¶ 19.

On February 2, 2013, Llaneza and the undercover agent completed most of the construction of the bomb, with the understanding that they would finalize its construction on the day of the attack by connecting a blasting cap and the trigger device previously constructed from the two cellphones Llaneza bought. They also tested the trigger device and confirmed that it operated correctly. Their work at the storage unit complete, the men once again traveled to the target bank branch in Oakland and conducted a further reconnaissance of the area. Llaneza told the undercover agent that he had jihad in his heart, considered jihad mandatory, and was willing to lay down his life for it. Id. ¶ 20.

February 7, 2013, was the day before the attempted bombing, which occurred during the early morning hours of February 8. On February 7, the undercover agent asked Llaneza if he still wanted to go through with the attack. The undercover agent told Llaneza that it was not too late to turn back and that they could take the bomb apart and leave town. Llaneza replied that he was ready and hoped the plot succeeded. Llaneza drove the SUV containing the purported car bomb from the storage unit in

Hayward to a parking lot in Union City. The undercover agent followed in a separate vehicle. While at the Union City parking lot, in the early morning hours of February 8, Llaneza completed assembly of the bomb in the presence of the undercover agent. Llaneza then drove the SUV to the Bank of America branch at 303 Hegenberger Road in Oakland, armed the trigger device, and parked the vehicle under an overhang of the bank building at approximately 12:29 a.m. He proceeded on foot to a nearby location a safe distance from the bank building, where he met the undercover agent. Once there, Llaneza attempted to detonate the bomb by using the second cellphone he had purchased to place two calls to the trigger device attached to the car bomb, at approximately 12:33 a.m. and 12:34 a.m. Federal agents then arrested him.

Llaneza was originally charged by complaint and had his initial appearance in court later on the morning of his arrest. A grand jury returned a single-count indictment charging him with attempted use of a weapon of mass destruction against property used in interstate commerce, in violation of 18 U.S.C. § 2332a(a)(2)(B), on March 7, 2013. He entered a guilty plea to the indictment on October 10, 2013.

**ARGUMENT**

Defendant attempted to destroy a bank building with a large bomb – a serious crime that calls for a substantial sentence. The 15-year sentence recommended by the plea agreement is substantial by any measure but also is half the length of the low end of the guidelines range. In proposing that sentence, the United States was significantly influenced by certain crucial facts. In particular, Llaneza sought to avoid rather than maximize casualties in the bombing. It also seems clear that his offense conduct was significantly influenced by his mental illness. In light of these considerations, the United States believes that, pursuant to 18 U.S.C. § 3553(a), a 15-year sentence followed by a lifetime of supervised release is sufficient but not greater than necessary to meet the purposes of the federal sentencing statute. We respectfully ask the Court to impose such a sentence.

I.     The Guidelines Sentencing Range is 30 Years to Life.

The PSR correctly calculates the guidelines sentencing range. Under sections 2K1.4(a)(4) and 2B1.1(a)(2) of the sentencing guidelines, the base offense level is 8. The loss of more than $7 million and the risk of death or serious bodily injury that would have resulted from the intended bombing increase the offense level by 20 and 2 points, respectively, pursuant to sections 2B1.1(b)(1)(K) and

2B1.1(b)(15). The adjustment for a federal crime of terrorism, under section 3A1.4, adds an additional 12 offense levels. Subtracting three offense levels for acceptance of responsibility under section 3E1.1 yields a final, adjusted offense level of 39. Under section 3A1.4(b), the defendant's criminal history category is VI. The intersection of this offense level and criminal history category yields a guidelines sentencing range of 360 months to life. U.S. Sentencing Guidelines Manual ch. 5, pt. A (sentencing table).

II.   A Sentence of 15 Years' Imprisonment Followed By a Lifetime of Supervised Release is Reasonable and Appropriate Here.

The guidelines are the starting rather than the end point of the sentencing process. The Court's ultimate charge is to fashion a sentence that is substantively reasonable based on the totality of the circumstances, in light of the sentencing factors established by 18 U.S.C. § 3553(a). United States v. Carty, 520 U.S. 984, 991-993 (9th Cir. 2008) (en banc). That sentence may be within, higher than, or lower than the guidelines range, so long as it is reasonable in light of the sentencing factors. Id. The totality of the circumstances here and the statutory sentencing factors counsel in favor of a sentence of 15 years' imprisonment followed by a lifetime of supervised release.

A.   The Nature and Circumstances of the Offense.

Defendants' offense conduct here was very serious. He knowingly and willfully participated in a plan to blow up a bank building. He created the plan and selected the target. He helped build what he believed to be a large bomb to accomplish the plan. He drove the bomb to the bank building, placed it in a location designed to maximize its destructive force, then attempted to detonate it twice. Had the bomb been real, it would have destroyed at least a portion of the building and easily could have killed or seriously injured innocent bystanders. Defendant's motive in the bombing was terroristic, as he sought to trigger a governmental response as a result of the bombing. These offense circumstances warrant a substantial sentence in order to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and deter others who might consider similar crimes. See 18 U.S.C. § 3553(a)(1), (2).

The United States has unfortunately seen several attempted terror bombings in recent years, in locations from Portland, Oregon, to New York City. Llaneza is like the defendants in those other cases

in that he sought to make a terroristic statement through a large bombing at a significant location. Unlike the many of the defendants in those other cases, though, Llaneza did not seek to kill or injure as many people as possible. Instead, he actively sought to avoid and minimize casualties by detonating the bomb in the early morning hours when, he hoped, no one would be present inside or near the building. That is a crucial distinction for the government between this and other terrorist-bombing cases. Llaneza's attempts to avoid and minimize casualties should not function as a get-out-of-jail-free card for him. He still attempted to destroy a symbolically significant target with the motivation of sowing terror. He further understood that the bombing might result in deaths and decided to proceed nevertheless. See, e.g., PSR ¶ 21 ("Llaneza indicated that he would still arm the device even if he saw a security guard at the bank"). But his consistent efforts to avoid or minimize casualties from the bombing mean he should be treated differently at sentencing than a defendant who attempted a terror bombing with the goal of maximizing death and bodily injury.

### B. The History and Characteristics of the Defendant.

The Court also should take account of Llaneza's mental health in fashioning an appropriate sentence. Llaneza suffers from substantial mental illness, having been diagnosed at various times with schizophrenia, schizoaffective disorder of the bipolar type, bipolar disorder, paranoid disorder, and post-traumatic stress disorder. Id. ¶¶ 58-63. It seems plain that this defendant's unique history of serious mental problems and his particular mental circumstances at the time of the offense influenced his offense conduct. As with his efforts to minimize casualties, Llaneza's mental illness should not function as a get-out-of-jail-free card. Among other things, his illness did not interfere with his ability to understand what he was doing, what its consequences might be, and how wrong it was. Moreover, the public needs protection from mentally ill criminals at least as much as it needs it from any other criminal. But to the extent mental illness was a contributing factor in his crime, and to the extent that illness can be addressed through treatment, those considerations should inform the sentence imposed.

In light of the totality of the circumstances, which also include defendant's swift guilty plea and acceptance of responsibilty, the United States believes that a 15-year prison term followed by a lifetime of supervised release is a reasonable and just sentence. The significant custody term is critical to addressing the seriousness of the offense and to providing just punishment, among other things. The

SENTENCING MEM.      7
CR 13-0145 YGR

lifelong supervised release is also a crucial component of the sentence.  Upon release from prison, Llaneza will be subject to supervision by a probation officer for the rest of his life.  He has agreed to an expanded search condition for the duration of his supervision that will make him subject to search with or without cause or suspicion at any time.  Another condition of his release would require him to participate in a mental health treatment program as directed by his probation officer.  These and other conditions of release, along with the deterrent effect of fifteen years of incarceration, should give confidence that Llaneza can live safely and peaceably in society after his release from prison in his early forties.

## CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to accept the plea agreement and to sentence defendant to 180 months in prison, a lifetime of supervised release, and the mandatory $100 special assessment.

DATED: February 24, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

_____/s/_____
ANDREW P. CAPUTO
Assistant United States Attorney